Robert E. FURMAN, Plaintiff,

v.

James B. SHERWOOD, Michael J.L. Stracey and Sea Containers Ltd., Defendants.

No. 92 Civ. 8206 (WCC).

United States District Court, S.D. New York.

Oct. 5, 1993.

Milberg Weiss Bershad, Specthrie & Lerach, New York City, (David J. Bershad, Steven G. Schulman, Lori G. Feldman, of counsel), The Law Offices of Lawrence G. Soicher, New York City, for plaintiff.

White & Case, New York City, (Richard W. Reinthaler, Cyrus Benson III, of counsel), for defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This class action suit is brought by plaintiff on behalf of all those who purchased common stock of Sea Containers Ltd. ("Sea Containers" or "the Company") between April 30,

1992 and October 5, 1992 and all those shareholders of Sea Containers who exchanged their Class B shares for Class A shares pursuant to an exchange offer which commenced on May 1, 1992. The complaint alleges violations of Sections 10(b), 13(e), and 20(a) of the Securities Exchange Act of 1934 and Rules 10b–5 and 13e–4(b)(1) promulgated thereunder, and a common law claim for negligent misrepresentation against defendants Sea Containers, James B. Sherwood, and Michael J.L. Stracey. The action is currently before the Court on defendants' motion to dismiss pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.P.

## BACKGROUND

Sea Containers is a Bermuda corporation engaged in three major lines of business. It manufactures, sells and leases marine cargo containers; it operates sea ports and passenger, automobile, and freight ferries; and it owns a number of hotels. Compl. ¶¶ 6, 20. In 1989 the Company became the subject of a hostile takeover attempt in reaction to which, in April 1990, Sea Containers sold substantial portions of both its dry cargo container and tank container fleets, and its conventional ferry and port business. Compl. ¶ 21(a). Sea Containers and a number of its subsidiaries also completed a tender offer for 7 million shares of the Company's common stock which resulted in Sea Containers' wholly-owned subsidiaries owning more than 50% of their parent. Compl. ¶ 21(a). Since, under a Bermuda Supreme Court ruling, Sea Containers' subsidiaries are permitted to vote the shares they hold in their parent, this ownership situation effectively insulated the Company from new hostile takeover bids. Compl. ¶ 21(b).

Nonetheless defendants Sherwood, the President and a Director of the Company, and Stracey, Sea Containers' Executive Vice President for finance, became concerned that in the future, if there were a change in Bermuda law or if the Company raised capital by selling common stock, Sea Containers might again find itself vulnerable to a hostile acquisition attempt. Compl. ¶¶ 7(a) & (b), 20(c). To address this concern, on March 24, 1992, the Company distributed notice of a special shareholders' meeting and enclosed a proxy statement seeking adoption of a resolution which would change the capitalization structure of the Company. Under the resolution, two classes of Sea Containers common stock would be created—Class B shares would continue to carry one vote per share but Class A shares, which would receive at least 10% higher dividend payments than Class B stock, would only carry one tenth of a vote per share. Compl. ¶¶ 22, 23(c). At the special shareholders' meeting, held on April 23, 1992, the capitalization and exchange plan (the "Exchange Offer") was approved by a majority of Sea Containers' shareholders. However, excluding those shares owned and voted by the Company's wholly-owned subsidiaries, only a minority of the public shareholders approved the plan. Compl. ¶ 22(b). The Exchange Offer provided that, effective June 23, 1992, Sea Containers' existing common stock would be reclassified as Class B stock, but that Class B shares could, at any time, be converted into Class A shares. Compl. ¶ 23(c). In addition, the Company offered to pay a special bonus of $0.15 for each Class B share tendered for conversion into Class A stock before June 23, 1992. Compl. ¶ 26.

## DISCUSSION

On a motion to dismiss we accept all allegations in the complaint as true, and dismiss only if, after drawing all inferences in plaintiffs' favor, it is clear that they are not entitled to relief. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The complaint sets out two somewhat distinct allegations of fraud. First plaintiffs point to a number of corporate statements made during the class period which they claim perpetrated a fraud on the market and artificially raised Sea Containers' common stock price. Second plaintiffs allege that a sub-class of people were fraudulently induced to convert their Class B share to Class A shares by false and misleading statements made pursuant to the Exchange Offer. We address each allegation in turn.

As a threshold matter, we must determine which documents are properly before the Court pursuant to this motion to dismiss. As

a general rule, a motion to dismiss addresses only the validity of plaintiffs' allegations as they appear on the face of the complaint. *Anderson v. Coughlin,* 700 F.2d 37, 40 (2d Cir.1983). Historically, a complaint was deemed only to include those documents either attached as exhibits or incorporated by reference therein. *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985). More recently, however, the Second Circuit has expanded the breadth of matters to be considered in deciding motions at the pleading stage of litigation to include documents publicly filed with the SEC and those documents upon which plaintiffs relied in framing their complaint. *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773–74 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991). Our consideration of a number of defendants' exhibits is appropriate because each document is at the least cited and discussed in the complaint.

### I. The Alleged Fraudulently Inflated Stock Price

The complaint sets out a litany of statements which are alleged to have been false and misleading and to have fraudulently inflated the price of Sea Containers' common stock during the class period. Plaintiffs claim that the Company created a deceptively bullish image of itself by making statements as to its container business, its ferry operations, and its plans for raising equity capital. Plaintiffs contend that this false perception of Sea Containers' positive prospects was shattered on October 5, 1992, when the Company announced that, contrary to earlier predictions, Sea Containers' ferry earnings had suffered in the third quarter of 1992 and that earnings for that quarter would show no improvement over earnings during the same period in the prior year. Compl. ¶ 38. The allegations are addressed in turn.

### A. Alleged False Statements Pertaining To The Company's Container Leasing Business

■ On April 30, 1992, the Company released its 1991 annual report from which the complaint cites the following statements regarding the prospects for Sea Containers' refrigerated container business:

In the sector of refrigerated containers nearly all our fleet is now either out on lease or is committed for lease, but we have taken a step beyond just traditional leasing. Our strategy team spent five months analyzing the current and future demand for refrigerated containers, utilization patterns by age of equipment and region of use, rate structures and repair and maintenance requirements. We also considered our future in the manufacturing of refrigeration systems for containers and the building of insulated containers for such systems, which we currently undertake in two factories in Singapore. We looked carefully at the evolution of chlorine-free refrigerants. *As a result of this study we have decided to implement a new approach to the refrigerated container leasing and sales business which we think will substantially increase profitability in the years ahead.*

Defs' Ex. 5 at 3–4 (emphasis added) (cited in compl. ¶ 24(a)(i)). Additionally, plaintiffs cite the following statements as to the prospects for the Company's container business made in a June 10, 1992 press release:

The on-take of new container equipment is proceeding at a faster rate than planned, Mr. Sherwood told the shareholders, due to stronger than expected demand. It is likely that the budgeted on-take of $130 million of new containers for the year will be exceeded.... Between the first quarter of 1991 and the first quarter of 1992 container division overheads as a percentage of revenue have declined 4%, with another 4% decline expected in each of the successive two years. By the first quarter of 1994 the Company's overhead as a percentage of revenue should be at the level just prior to the sale of its dry cargo and tank container fleets to Tiphook in the second quarter of 1991. Mr. Sherwood said that container lease rates on average had shown no decline over the past year despite the decline in interest rates. In

fact, rates for refrigerated containers are showing a meaningful increase in step with increased demand. Mr. Sherwood said the company's entire serviceable refrigerated container fleet was now out on lease or committed for lease. Demand for the company's new Series III SeaCold refrigeration system for containers which operates on chlorine free gas has been so great that the SeaCold factory in Singapore is now booked to capacity for many months ahead. The company's container fleet is now close to full employment at 88% utilization Mr. Sherwood indicated, because at any moment in time there are units under repair and some inventory is required in depots. The company has successfully re-entered the tank container leasing market with several hundred units now on lease.

Defs' Ex. 6; compl. ¶ 32. Finally, the complaint cites the following statement from the Company's August 13, 1992 press release:

Mr. Sherwood indicated that marine container utilization remains steady at 88% and lease rates remain firm. The company is experiencing shortages of many equipment types. He said that the on-take of new containers combined with improved results from the company's containerships should result in continued improvement of earnings from this division for the balance of the year.

Compl. ¶ 36 (quoting Defs' Ex. 3 at 2). Plaintiffs claim that these statements were misleading because they failed to disclose that the Company's container leasing business was increasingly focused on non-refrigerated containers which were more vulnerable to cyclical economic forces. Compl. ¶¶ 25(a), 33(a), 37(b).[1] This allegation is meritless.

█ The complaint does not contest the truthfulness of any of the facts which Sea Container disclosed regarding its container business. Plaintiffs only claim that the positive forecasts of the container sector's future performance were false and misleading because of the failure to disclose the fact that the Company's container business was becoming more dry-cargo-container intensive. Statements which predict the Company's future performance may be the basis of a securities claim only if they were disseminated knowing they were false or the method of their preparation was so egregious as to render their dissemination reckless. *Estate of Detwiler v. Offenbecher,* 728 F.Supp. 103, 137 (S.D.N.Y.1989); *see Virginia Bankshares, Inc. v. Sandberg,* —— U.S. ——, ——, 111 S.Ct. 2749, 2758, 115 L.Ed.2d 929 (1991). Defendants argue that the complaint states no facts which might support either conclusion and therefore contend that these allegations are not set out with the particularity required by Rule 9(b). In any case, defendants take the position that this portion of the complaint fails to state a claim upon which relief can be granted and therefore should be dismissed under Rule 12(b)(6).

█ At a minimum these conclusory allegations as to the Company's container business are deficient under Rule 9(b), Fed. R.Civ.P., which requires that a complaint identify: the fraudulent statements made; how they were fraudulent; and when, where and by whom they were made. *Cosmas v.*

---

1. Similarly, plaintiffs cite a May 14, 1992 press release in which the Company discusses its first quarter, 1992 performance and makes the following statements as to the Company's container business:

... At the pre-tax level, container asset rentals and sales generated a profit of $6.1 million compared with $5.7 million in the first quarter of 1991 (which included a gain on sale of ships of $1 million not repeated in 1992's first quarter). [a discussion of the Company's ferry, port, and hotel sectors].

Mr. James B. Sherwood, president, said that the company was performing in line with internal forecasts for the year which anticipate a significant improvement in net earnings and earnings per common share. At April 30, 1992 the company had taken delivery of $47 million of new containers since the start of the year and expected to achieve its budgeted purchases of approx. $130 million of new containers for the full year. Container utilization currently stands at 88.2%, up 1% since the beginning of the year. Lease rates have been steady for most equipment types and have been trending upwards for refrigerated containers....

Defs' Ex. 1 at 1–2 (cites in compl. ¶ 28). Plaintiff alleges that these statements were misleading because they failed to disclose that the container leasing operations were experiencing weakening demand and negative pricing pressure. Compl. ¶ 29(b).

*Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Rule 9(b) permits pleadings based on information and belief only when the facts are particularly within the opposing party's knowledge and then only if the allegations are accompanied by specific facts which support a strong inference of fraud. *Id.* at 11–12; *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990).

Plaintiffs supply no facts to support this conclusory allegation; indeed the complaint alleges that in 1989 the Company sold a substantial portion of its dry cargo and tank container fleets to Tiphook plc, a British container leasing company, compl. ¶ 21(a), which tends to contradict the conclusion that the Company's business was becoming more dry-cargo-container intensive. In addition, it is not clear from the complaint how a reasonable investor could have drawn any conclusion as to the growth and performance of the Company's dry container sector from the language quoted from the 1991 annual report. The statement is expressly limited to a discussion of the refrigerated container sector and, several paragraphs later in the annual report, the Company discusses the status of the refrigerated, tank, and dry cargo container sectors and the proportion that each represents of the Company's total container fleet.

> In 1991 we acquired $122 million of new containers and related equipment; we are forecasting a similar on-take of such units in 1992. At March 31, 1992 our container fleet numbered 140,000 twenty foot equivalent units representing an investment at original cost of $607 million. Demand for our containers has consistently outstripped our ability to supply for most of 1991 and we expect this situation to prevail throughout this year, although the "mix" of our customer demands may change slightly. For example, we re-entered the tank container leasing business on April 2, 1992 at the end of the two year no-compete period agreed at the time we sold our tank container fleet in 1990. We are now concluding a number of tank leases with our former customers as well as new ones. We think there may be a slight weakening of demand for ordinary dry cargo containers in 1992 but since our entire fleet of 45,000 such units is new and has been leased for three years or longer, such weakening would have no impact on us.

Defs' Ex. 5 at 4–7. In addition, both the June 10, 1992, and the May 14, 1992, press releases contain language to the effect that the overall lease rate for containers as a whole had remained steady while the rate for refrigerated containers had been increasing. *See supra* at 6–7 & n. 1. Since plaintiffs fail to state any facts in support of these charges and since every fact before the Court cuts against plaintiffs' claims, the allegation that the Company's prognostications as to the performance of its container sector were misleading fails to meet the requirements of Rule 9(b), Fed.R.Civ.P.

However, these allegations are flawed at a more fundamental level. The gist of the complaint at bar is that Sea Containers made several false and misleading statements during the class period which elevated the Company's stock price to an artificial high. Plaintiffs then contend that the market was shocked by a press release dated October 5, 1992, in which "Sea Containers repudiated its prior positive assurances" resulting in a decline in stock price. Compl. ¶ 38. However, to the extent that the complaint relies on positive forecasts made as to the Company's container business, the alleged watershed press release does not repudiate these representations but in fact confirms their validity. The October 5, 1992 press release reads as follows:

> ... *estimated third quarter ... earnings from container asset leasing have continued to improve* but ... ferry earnings are likely to be flat compared with third quarter of 1991. [A prolonged French truck driver strike, poor weather, and the U.K. recession] have resulted in lower than expected profitability from the company's Hoverspeed Ltd. subsidiary. Hotel earnings have generally improved over the prior year's third quarter but tourist train performance in the company's 42% owned Orient–Express Hotel Inc. affiliate has been disappointing due to recession in the U.S. and U.K. which are the primary pas-

senger markets. After giving effect to these developments, the company estimates net earnings after preferred share dividends in the third quarter ended September 30, 1992 will be at a similar level to those of the third quarter of 1991 ($19.2 million).

Defs' Ex. 4 (emphasis added). Since the complaint fails to particularize the claim that the Company's forecasts for its container business were made with the intent to raise Sea Containers' stock price to an artificial high and since, even with the benefit of hindsight, plaintiffs are unable to allege facts establishing that the predictions were not realized, we find these allegations fail to state a claim upon which relief can be granted. Thus, they are dismissed pursuant to Rule 12(b)(6), Fed.R.Civ.P.

### B. Alleged False Statements Pertaining To Sea Containers' Ferry Business

■ The complaint cites the following statement from the Company's 1991 Annual Report regarding Sea Containers' ferry operations:

Our new SeaCat ferries are now providing dependable service and are beginning to show the results we expected from the beginning. English Channel bookings are currently up by more than 50% over this time last year. *1992 should prove to be the strongest year ever for ferry travel between Britain and France* because of the opening of EuroDisney near Paris, the Expo in Seville and the confidence generated by the Conservative election victory in the U.K. Our domestic ferry routes in Britain and those of our Irish Sea affiliates (in which we own a 41% interest) are showing a good start in 1992, reflecting this new confidence

Defs' Ex. 5 at 4 (emphasis added) (cited in compl. ¶ 24(a)(ii)). Further, plaintiffs quote the following statements regarding the prospects of the Company's ferry business from a May 14, 1992 press release:

[Discussion of 1992's first quarter performance in general and container sector performance in particular] The loss on ferry and port operations slightly widened from $7.7 million in the first quarter of 1991 to $8.3 million in the first quarter of 1992 but this was artificial in that the heavy Easter travel period fell in the first quarter of 1991 while in 1992 it fell in the second quarter. Had Easter fallen in the first quarter of 1992, ferry earnings would have been approx. $1.7 million higher than reported. The second quarter of 1992 will reflect this benefit compared with the second quarter of 1991. [discussion of first quarter hotel performance]. An increase in preferred share dividends of $1.4 million held down the improvement in earnings on common shares, however, there was still a 17% betterment from a loss of 94 cents per common share last year to a loss of 78 cents per common share in this year's first quarter. Due to the highly seasonal nature of the ferries and hotels businesses, the company's profits are concentrated in the second and third quarter of the year, with the first quarter traditionally reporting a loss and the forth quarter breakeven.

*Mr. James B. Sherwood, president, said that the company was performing in line with internal forecasts for the year which anticipate a significant improvement in net earnings and earnings per common share.*

Compl. ¶ 28(b) (quoting Defs' Ex. 1). Plaintiffs allege that these bullish predictions were false and misleading because "weak demand and a competitive price environment in the English Channel area … were causing results from the ferry and port units to be weak." Compl. ¶ 25(b); *see* compl. ¶ 29(a).[2]

Plaintiffs offer no facts to support this conclusory allegation, and therefore it is dismissed pursuant to Rule 9(b), Fed.R.Civ.P. We note that the annual report contains an entire section on the Company's ferry and

---

2. Paragraph 29(a) of the complaint asserts that the competitive price environment was created by alternative means of transport in the English Channel market. Although it contains slightly more information than the above quoted paragraph of the complaint, this claim is still a long

way from meeting the particularity requirement of Rule 9(b), Fed.R.Civ.P. If plaintiffs' counsel elects to replead this allegation, we suggest he study the extensive discussion of Sea Container's English Channel competition in the December 1991 10–K filing. *See* Defs' Ex. 9 at 15–16.

port business in which the Company discusses in seven separate paragraphs the obstacles it has faced on its various ferry routes and each route's prospect for the future. The complaint does not take issue with any of these representations. The first sentence of this section of the annual report states: "Wightlink Ltd., our largest ferry business, had a satisfactory year although earnings were 20% less than originally forecast. The reduced earnings were attributable to the U.K. recession." Similarly, the May 14, 1992 press release states that its optimistic predictions as to the Company's ferry business were predicated on an improvement in the British economy. The complaint terminates its quotation of the press release before the following statement:

> An excellent year is forecast for ferries and ports ... The opening of EuroDisney near Paris is stimulating travel across the English Channel. *Economic recovery in Britain should improve results of Wightlink and the Isle of Man Steam Packet Company.*

Defs' Ex. 1 at 2 (emphasis added).

█ Predictive statements may not serve as the basis for a securities fraud claim when defendants seasoned their forecast with words that bespeak caution. *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986). Further, optimistic predictions can be qualified by the simultaneous recognition of conflicting evidence from which another might draw the alternative conclusion. *Robbins v. Gitano Group, Inc.*, 1992 WL 276837 (S.D.N.Y.1992). Sea Containers' positive forecasts for its ferry operation made in its 1991 annual report and the May 14, 1992 press release are clearly predicated on the anticipated economic revival in the U.K. and increases in demand due to EuroDisney and other continental attractions. The lack of particularity in the complaint leaves this Court and defendants to speculate whether the alleged undisclosed "weak demand and a competitive price environment in the English Channel area" actually refers to these disclosed risks or whether some other concealed risk is at the heart of plaintiffs' claim. We grant plaintiffs' counsel's motion to amend this allegation so as to enlighten us as to what particular information defendants withheld from the market, that is if such an amendment can be undertaken within the constraints of Rule 11, Fed. R.Civ.P.[3]

Plaintiffs additionally quote the Company's June 10, 1992 press release as follows:

> Although the United Kingdom ferries market is still being held back by the serious recession prevailing in the country, Mr. Sherwood said that English Channel bookings for the peak third quarter holiday season were running 50% above year earlier levels.

Compl. ¶ 32 (quoting Defs' Ex. 6 at 2). Plaintiffs allege that this statement was false and misleading because it failed to disclose that the increase in English Channel bookings had been accomplished largely through price reductions. Compl. ¶ 33(b). This fact, however, was disclosed during the class period in an August 13, 1992 press release as follows:

> Despite no sign of recovery in Britain's economy, ferry travel continues to increase. *Although yield is down somewhat due to passengers taking advantage of special offers, additional volume has more than compensated.* The company's main earnings period for its ferries and ports is the third quarter and the outlook for this year's third quarter is excellent, according to Mr. James B. Sherwood, president.

Defs' Ex. 3 at 2 (emphasis added) (cited in compl. ¶ 36). Surely before the close of the class period the market was aware of Sea Containers' price reductions on its English

---

3. Similarly plaintiffs take issue with the following generalized bullish statements in the August 13, 1992 press release:

> [a discussion of the Company's favorable performance in the second quarter of 1992] [I]f results were this strong in a period of serious recession, the outlook for the company in a period of normal economic growth must be highly favorable.

Compl. ¶ 36. Plaintiffs claim that Sea Containers should have disclosed that the "outlook [for] its primary business operations was deteriorating" and would adversely affect the financial results for the remainder of the fiscal year. Compl. ¶ 37(c). This conclusory allegation is dismissed pursuant to Rule 9(b), Fed.R.Civ.P. subject to plaintiffs' right to replead as outlined above.

Channel ferry routes. Thus, this allegation is dismissed pursuant to Rule 12(b)(6), Fed. R.Civ.P.[4]

■ Plaintiffs then claim that the above quoted statement from the August 13, 1992 press release was rendered false and misleading by the failure to disclose that a July 1992 French truck driver strike would adversely affect the Company's English Channel port and ferry operations. Compl. ¶ 37(a). We find that this allegation is sufficiently particular under Rule 9(b) and states a colorable claim upon which relief might be granted.

Defendants argue that this claim fails to set out particularized facts from which an inference of scienter might be drawn. We disagree. Defendants admit that they knew of the trucking strike when they issued the rosy predictions as to the performance of the Company's ferry operations in the third quarter of 1992. Nonetheless the forecast was in no way qualified by a discussion of the strike's possible effect on the sector's third quarter performance. Less than two months later, the Company issued a statement that third quarter earnings would show no improvement over the prior year, citing, among other causes, the prolonged French truck driver strike. How else can a plaintiff plead that a prediction was intentionally false or recklessly made than to allege that one of the facts which defendants admit led to the forecast not being realized was known to, but not considered by, the defendants at the time the prediction was made?[5]

■ Defendants also contend that they had no obligation to disclose the French truck driver strike since it was a well publicized event of which the market certainly had knowledge. *See Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978) (the lack of discussion must be viewed in light of the fact that the Company's labor difficulties were a matter of general public knowledge). However, defendants mischaracterize plaintiffs' allegation. Plaintiffs are not claiming that the market was defrauded by the failure to disclose the strike; undoubtedly as soon as the strike occurred in July of 1992, this fact entered the total mix of information available to the market and the price for Sea Container stock was affected accordingly. The alleged fraud occurred when, weeks after this highly publicized strike, the Company added to the mix of information available to the market its prediction that third quarter ferry earnings would be "excellent". Such a statement is reasonably understood to rest on a factual basis that justifies its accuracy, and absent such a basis the statement may be found sufficiently misleading to support a securities violation. *Virginia Bankshares*, —— U.S. at ——, 111 S.Ct. at 2758. The October 5, 1992 press release disclosed that Sea Containers had not accounted for the effect of the French trucking strike in making its August 13, 1992 prediction. Therefore, from the information available to the Court at this early stage, it seems that a reasonable fact finder may conclude that the prediction was made in reckless disregard for the truth. Defendants' motion is denied as to this allegation.[6] *Robbins v. Moore Medi-*

4. As stated above plaintiffs' allegation can not support a claim of fraud for the class period alleged. This allegation may support a claim for a sub-class of plaintiffs (i.e. those who purchased stock between June 10, 1992 and August 13, 1992). Plaintiffs are granted leave to replead such an allegation assuming that the additional elements of securities fraud, such as damage, may be pled as to this sub-class.

5. Defendants cite *Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), in which the Court upheld a dismissal of a Rule 10b–5 claim under Rule 9(b). However, *Ross* dealt with the timeliness with which a corporation disclosed that one of its products was unsafe, and the complaint did not state plaintiffs'

basis for alleging defendants' knowledge that the product was unsafe. In the instant case, it is undisputed that defendants knew of the French truck driver strike when the positive prognostications as to the third quarter earnings were made, and it is equally undisputed that the Company cited the strike as one of the reason why the forecast was not realized. We will not require plaintiffs to make a greater showing without the benefit of discovery.

6. Defendant Stracey argues that plaintiffs have failed to allege his connection to the fraudulent conduct and thus, moves to dismiss the claims against him under Rule 9(b). Generally when plaintiffs charge multiple defendants with securities fraud, Rule 9(b) requires a specific allegation of each defendant's participation in the fraud.

*cal Corp.*, 788 F.Supp. 179, 183–86 (S.D.N.Y. 1992) (omission of known corporate problems coupled with optimistic statement stated a claim for securities fraud).

### C. Alleged False Statements Pertaining To Sea Containers' Plans For Future Equity Financing

 Plaintiffs quote the following statement from the June 10, 1992 press release:

The dual common share plan which is scheduled to take effect on June 23, 1992 will allow the company to issue new equity when common share prices are higher than today, without disturbing the present balance of shareholder interests.

Compl. ¶ 32 (quoting Defs' Ex. 6 at 2). The complaint cites statements to the same effect in the 1991 annual report and a May 29, 1992 letter from Sherwood to the Company's shareholders. *See* compl. ¶ 24 (citing Defs' Ex. 5) and compl. ¶ 30 (quoting Defs' Ex. 8) respectively. Plaintiffs allege that these statements were false and misleading because they failed to disclose that the Company's deteriorating operating results made it unlikely that its common share price would increase in the near future. Compl. ¶¶ 31(a), 33(c).

In addition to pointing out that these allegations are wholly inadequate under Rule 9(b), defendants argue that the statements to which plaintiffs object can not be read as implying or in any way predicting that Sea Containers common stock price *would* increase in the near future. The representations simply state, in effect, that equity capital can be raised when (and if) the stock price increases. This is particularly true given that the March 24, 1992 letter, which notified all shareholders of the special shareholders

meeting, stated that "[t]he Company has no present plans for financing involving the issuance of equity securities." Defs' Ex. 7 (cited in Compl. ¶ 22). Since all shareholders were aware that Sea Containers had no plans to raise equity capital in the near future, the Company's discussion of the market conditions under which it could raise equity capital cannot be read as a prediction that those market conditions were likely to occur any time soon. These allegations are dismissed pursuant to Rule 12(b)(6), Fed.R.Civ.P.

### II. Fraud Allegations As To Sea Container's Exchange Plan

Plaintiffs claim that they were fraudulently induced to convert their Class B shares into Class A shares by defendants' threats that the Class B shares would be delisted from the New York Stock Exchange and by statements made by defendants which falsely implied that the recapitalization was a necessary precondition to the Company obtaining equity financing in the future. We find that neither allegation is sufficient to support a securities fraud claim.

### A. Statements Warning Shareholders That The Class B Shares Could Be Delisted

 The complaint cites two instances where Sea Containers warned its shareholders of the possibility that their Class B shares could be delisted as a result of the Exchange Offer. The first is the Offering Circular dated April 30, 1992, which contains the following statement:

The Company will also file a supplemental listing application regarding the Class B Common Shares. However, it is possible that the Class B Common Shares would be

*Luce*, 802 F.2d at 55. However, in cases like the one at bar, where the alleged false and misleading statements were made in Sea Containers' annual report and Company press releases, no such connection need be pled because such documents are presumed to entail the collective actions of the directors and officers. *In re AnnTaylor Stores Sec. Litig.*, 807 F.Supp. 990, 1005 (S.D.N.Y.1992); *Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F.Supp. 658, 667–68 (S.D.N.Y.1987); *Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 911 (S.D.N.Y.1983); *see Luce*, 802 F.2d at 55 ("no specific connection

between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question"). Stracey's motion is denied.

In a footnote to their 81–page brief, defendants argue that the complaint fails to present facts indicating that Stracey is subject to personal jurisdiction in the United States. Defs' Br. at 76 n. 52. Plaintiffs' submissions cite a number of connections Stracey has to this jurisdiction. Pls' Br. in Op. at 72 n. 36. Plaintiffs may include these allegations in their amended complaint.

delisted by the NYSE if, after the completion of the Exchange Offer, the number of holders of Class B Common Shares fails to meet the distribution and other requirements of the NYSE for continued listing. In that event, it is possible that such other exchanges would also delist the Class B Common Shares, that there would be no established trading markets for the Class B Common Shares and that, under applicable margin regulations, such shares could not be used as security for the extension of credit.

Defs' Ex. 2 at 8 (cited in Compl. ¶ 26). The second is a letter written by defendant Sherwood to Sea Containers' shareholders dated May 29, 1992 which describes the recapitalization and exchange offer and contains the following statement:

> Your Class B common shares MAY BE DELISTED from the New York Stock Exchange where the Class A shares are expected to be listed. While you will be able at a later date to convert Class B shares into Class A ones, such conversion MAY CAUSE DELAY which can be avoided if you convert your shares now.

Defs' Ex. 8 (quoted in Compl. ¶ 30). Plaintiffs claim that these representations were false because "defendants knew or recklessly disregarded through their contacts in the investor community and the reaction of such investors to the dual capitalization plan that many investors would refuse to participate in the Exchange Offer and there would continue to be a sufficient number of Class B common shares outstanding and in public hands to qualify for and maintain listing on the NYSE." Compl. ¶ 27. This portion of plaintiffs' allegations is wholly without merit.

■ Again plaintiffs' claim fails to meet the requirement of Rule 9(b). It is impossible for the Court or defendants to ascertain who these mysterious "contacts in the investor community" are and how they enabled Sea Containers to read the minds of its shareholders so as to predict the number of Class B shares that would be tendered for conversion. However, as discussed below, these allegations are more seriously flawed and therefore are dismissed pursuant to 12(b)(6), Fed.R.Civ.P.

As it pertained to the listing of Sea Containers' equity securities on the NYSE, there were three possible ramifications of the Company's Exchange Offer. First, if too few shareholders converted their Class B shares to Class A shares, the Class A shares would not be listed on the exchange. The Offering Circular disclosed this risk.

> The Company will file an application to list the Class A Common Shares on the [NYSE]. The NYSE has indicated that, *subject to meeting its distribution requirements,* the Class A Common Shares will be listed on the NYSE.

Defs' Ex. 2 at 1 (emphasis added).[7] On the other hand, if the number of publicly held Class B shares remaining after the Exchange Offer failed to meet the NYSE listing requirements, delistment of the Class B shares was a possibility. Finally if a moderate number of Class B shares were converted, both classes of stock could remain listed on the exchange. Plaintiffs allege that, since the latter scenario actually transpired, it was fraudulent for Sea Containers to have warned their stock holders of the other possibilities.[8] We will not permit such a patent allegation of fraud by hindsight to stand.[9]

7. This was a significant risk for those who tendered their stock early in the Exchange Offer period. Shareholders who tendered early were gambling that other shareholders would convert their stock in sufficient amounts to get the Class A stock listed on an exchange. It seems likely that, in addition to promoting managements' Exchange Offer objectives, Sea Containers offer of a $0.15 per share bonus to those who tendered before June 23, 1992 was intended to compensate these shareholders for the risk they incurred.

8. We note that the failure to warn shareholders of the risk of delistment created by a tender offer

has been upheld as a predicate for a securities violation. *Sonesta Int'l Hotels Corp. v. Wellington Assoc.,* 483 F.2d 247, 253 (2d Cir.1973). Thus, allowing plaintiffs' allegation to stand would place every tender offeror in a Catch–22 dilemma.

9. In addition it does not seem that the "threats" of delistment were designed to "coerce" Class B shareholders to convert their shares. The Exchange Offer was designed so that Class B shares could *at any time* be converted into Class A shares. A shareholder who was concerned that he hold only listed securities could simply retain

*Cf. Missouri Portland Cement Co., v. H.K. Porter Co.,* 535 F.2d 388, 393 (8th Cir.1976) (where delisting "could conceivably have occurred," disclosing the possibility does not state a securities claim upon which a preliminary injunction may be issued); *see generally Denny v. Barber,* 576 F.2d 465, 470 (2d Cir. 1978) (J. Friendly) (rejecting allegation of fraud by hindsight).

B. *Statements Implying That The Exchange Offer Was A Necessary Precondition To The Company Obtaining Future Equity Financing*

Plaintiffs quote the May 29, 1992 letter to Sea Containers' shareholders as follows:

> [One of the advantages of converting your Class B shares into Class A shares is that] ... You will facilitate the company's ability to RAISE NEW EQUITY when market conditions are satisfactory, meaning when common share prices are at a higher level than today. Your company is engaged in capital intensive industries requiring debt financing. Lending institutions impose debt to equity ratios and your company may have to slow its rapid growth to stay within these ratios if its equity base cannot be increased

Compl. ¶ 30 (quoting Defs' Ex. 8). Plaintiffs claim that this statement implied that completion of the Exchange Offer was a necessary precondition to future equity financing and that defendants failed to disclose that equity financing could be obtained under the then existing capital structure but only at the risk of undermining management's entrenched control of the Company. Compl. ¶ 31(b).

The complaint misleadingly terminates its quote of the May 29, 1992 letter before the following statement:

> his Class B shares until a sufficient number of other shares had been tendered to ensure that the Class A stock would be listed. Of course those who adopted this wait-and-see strategy had to forego the $0.15 per share tendering bonus. Nonetheless, Class B shareholders were never put in a situation where they had to tender their shares or risk being stuck with unlisted securities. If his Class B shares were delisted, the shareholder could convert them into listed Class A shares.

A majority of the common shares of your company is today held by "insiders" including myself. This control situation has worked to the enormous benefit of shareholders in the past. Because "insiders" held a strong position in the common shares in 1989, your company was able to fend off a coercive takeover bid at an unacceptably low price, sell assets at satisfactory prices and purchase along with subsidiaries a total of 14 million common shares at $35 each (the shares were selling at half this price shortly before the takeover commenced). The controlling shareholders and your directors believe it is in the best interest of the company and the other shareholders that the present majority position not be disturbed so that any future hostile attempt to gain control of your company at less than a fair price may not succeed. *Hence the need for the Class A shares plan if additional equity is to be raised to fund expansion, allowing a rapid increase in earnings.* We discovered in the takeover battle of 1989 that some investors preferred to take the first offer of the takeover predator and had no commitment to the continued existence of your company or the other shareholders seeking fair value for their shares. We have little sympathy with such a position.

Defs' Ex. 8 (emphasis added). This discussion and representations to the same effect in both the 1991 annual report and July 10, 1992 press release [10] disclosed the fact that the Exchange Offer was designed to entrench management's control of the Company while preserving the Company's flexibility to raise equity capital in the future, and any Class B shareholder who converted his shares to Class A stock was fully aware that he was furthering these ends. Therefore,

---

**10.** Both the 1991 annual report and the June 10, 1992 press release contain statements to the effect that the exchange plan will allow the company to issue new equity without disturbing the present balance of shareholder interest. *See* Defs' Ex. 5 at 16 and Defs' Ex. 7 at 2 respectively.

plaintiff's allegation is meritless.[11]

## CONCLUSION

For the foregoing reasons defendants' motion to dismiss the complaint pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.P., is granted as to all allegations except those supported by the misleading prediction of ferry performance made in the August 13, 1992 press release. Plaintiffs shall have leave to replead their additional alleged false and misleading statements pertaining to Sea Containers' ferry business as specified in Part "I.B." of our discussion, within thirty days from the date of this decision. The remainder of plaintiffs' allegations are dismissed with prejudice.

SO ORDERED.

---

**11.** As noted in defendants' submissions, the allegations discussed in part I of this decision are made on behalf of "purchasers" of Sea Container stock during the class period. It is unclear from the complaint whether persons who converted their Class B shares for Class A shares pursuant to the Exchange Offer are alleged to be "purchasers" included in the class. Defs' Br. in Sup. at 20 n. 9 & 10. This takes on particular significance given our dismissal above of the Exchange–Offer–specific allegations.

The alleged violation of section 13(e) of the Securities Exchange Act of 1934 and Rule 13e–4(b)(1) promulgated thereunder and the negli-gent misrepresentation claim are brought only on behalf of those plaintiffs who converted their stock pursuant to the Exchange Offer. It is unclear whether the false and misleading statements discussed in part "I" above were intended to support these claims or whether their only basis is the Exchange–Offer–specific representations dismissed in part "II" of the above decision. Therefore, consideration of defendants' motion to dismiss these causes of action is postponed until the complaint has been amended to clarify whether plaintiffs still wish to assert these claims based on the factual allegations that remain.