802 F.2d 49
 Fed. Sec. L. Rep. P 92,932, 6 Fed.R.Serv.3d 117
 Henry LUCE III, Martin E. Messinger, Arthur Goldberg, Simon
Akst, Marvin Bostin, Marshall Butler, Paul Caccia, John J.
Colgan, Jr., Leslie Cooper, Joseph Cusenza, Thomas Despagni,
James Foledy, Ariel Halpern, David Hunter, David Kaplan,
Lawrence Linehan, Michael O'Daly, David Peleger, Robert
Shapiro and Herbert Weller, Individually and on behalf of
the limited partners of 583-587 Broadway Associates, and
derivatively on behalf of 583-587 Broadway Associates,
Plaintiffs-Appellants,
v.
Jonathan H. EDELSTEIN, Carol Kohlreiter Levy, George
Kazantzis, Leonard V. Gray, A. Michael Victory, HQZ
Enterprises, Inc., HQZ Fine Arts, Inc., Individually and as
general partners of 583-587 Broadway Associates, Cumberland
Investment Group, HQZ Development Corporation, HQZ Arts,
Inc., Petcap Development Corporation, Petra Capital
Corporation and 583-587 Broadway Associates, a New York
Limited Partnership, Defendants-Appellees.
 No. 1247, Docket 86-7120.
 United States Court of Appeals,
Second Circuit.
 Argued May 12, 1986.
Decided Sept. 26, 1986.
 
 Jonathan S. Gaynin, New York City (Melinda Socol and Maryanne Cunningham, of counsel), for plaintiffs-appellants.
 Jane W. Parver, New York City (Jay G. Strum, Peter C. Harvey, Kaye, Scholer, Fierman, Hays & Handler, of counsel), for defendants-appellees Jonathan H. Edelstein, George Kazantis, Leonard V. Gray, A. Michael Victory, HQZ Enterprises, Inc., HQZ Fine Arts, Inc., Cumberland Inv. Group, HQZ Development Corp., and HQZ Arts, Inc.
 Jules D. Zalon, New York City, for defendant-appellee Carol Kohlreiter Levy.
 Before MANSFIELD, CARDAMONE, and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This case involves allegations of fraud in the solicitation of investors in an ill-fated real estate partnership. Judge Carter denied plaintiffs' request for preliminary injunctive relief and dismissed claims based on the Securities Act of 1933 and pendent state law claims on the basis of a forum-selection clause in the partnership agreement. He retained jurisdiction over the federal claims arising under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1982), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. Sec. 240.10b-5 (1986), but in a subsequent order dismissed the federal claims for failure to plead fraud with particularity. Fed.R.Civ.P. 9(b). Leave to amend was not granted. Plaintiffs appeal. We affirm the denial of injunctive relief and the dismissal of pendent state law claims. We reverse in part the dismissal of the federal claims, and remand with instructions that plaintiffs be given leave to amend their complaint.
 
 BACKGROUND
 
 2
 The twenty named plaintiffs purport to represent a class of purchasers of limited partnership interests in 583-587 Broadway Associates ("Broadway Associates"). Defendants HQZ Enterprises, Inc. ("HQZ Enterprises") and HQZ Fine Arts, Inc. ("HQZ Fine Arts") are the general partners of Broadway Associates. Their affiliates are defendants Cumberland Investment Group ("Cumberland"), a New York limited partnership; HQZ Development Corp. ("HQZ Development"), a New York corporation; Petra Capital Corp. ("Petra"), and its subsidiary, Petcap Development Corp. ("Petcap") both Delaware corporations; and HQZ Arts, Inc. ("HQZ Arts"), a New York corporation owned by Cumberland and Petcap. According to the complaint, HQZ Enterprises and HQZ Fine Arts are the "alter egos" of their affiliates, and the affiliates exercised complete direction and control over the partnership. All five of the individual defendants are past or present directors and officers of HQZ Enterprises and HQZ Fine Arts, and "some or all" of the individual defendants are the past or present officers or principals of Cumberland, Petra, Petcap, and HQZ Arts.
 
 
 3
 Assuming as we must that the facts alleged in the complaint are true, the purportedly fraudulent scheme may be described as follows. HQZ Arts bought buildings located at 583-587 Broadway and 154 Mercer Street in late 1981, with the participation and/or funding of HQZ Development, Cumberland, Petra, and Petcap. Subsequently, Broadway Associates was established as a limited partnership with HQZ Enterprises and HQZ Fine Arts as general partners. Pursuant to a Private Placement Offering Memorandum ("Offering Memorandum") dated December 17, 1981, the general partners solicited limited partners to provide capital for a venture that would renovate the buildings and convert them into condominium units for artists and art-related businesses. The Offering Memorandum stated that 32 limited partnership interests would be sold to no more than 35 persons, each limited partnership requiring $22,344 in cash and a letter of credit for $103,125. The letters of credit would be used to secure a $3 million loan to the partnership from Morgan Guaranty Trust Company ("Morgan"). According to the Offering Memorandum, the full amount of the cash proceeds from the offering, plus the Morgan loan proceeds and a $385,000 contribution by the general partners, would be used as follows: (1) to repay loans to HQZ Arts and other affiliates; (2) to pay the balance of the purchase price on the properties; and (3) to provide working capital for Broadway Associates. The closing date for subscription to the offering and the Broadway Associates Limited Partnership Agreement (the "Partnership Agreement") was set for year-end 1981.
 
 
 4
 HQZ Arts transferred the properties to Broadway Associates on December 30, 1981. However, only sixteen limited partnership interests had been purchased by that time, and the general partners issued a Supplement to Private Placement Memorandum ("Supplemental Memorandum") on December 31, stating that the Broadway Associates partnership had been formed with interests aggregating only $1,950,000, instead of $3,715,000. The Supplemental Memorandum also stated that the partnership had granted Petcap a first mortgage in the real estate in the amount of $1,352,932, and that HQZ Fine Arts had given Petcap a promissory note for $300,000 and agreed to deliver its preferred stock to Petcap on or before the note's due date of February 28, 1982.
 
 
 5
 According to the complaint, very little went as expected in the renovation project. Instead of repaying the partnership's outstanding debts, defendants caused it to continue to borrow additional funds, including a construction loan of $2.2 million from Central Federal Savings Bank ("Central"). Further, HQZ Fine Arts neither repaid the promissory note to Petcap nor delivered the preferred stock. Defendants even failed to pay the real estate broker's commission on the acquired property, issuing instead another mortgage note. Defendants then assigned all the partnership's notes, except the $3 million loan from Morgan, to an "agent or employee," thereby consolidating the partnership's debts.
 
 
 6
 The Offering Memorandum stated that construction would be completed and the condominium units sold by the end of 1982. Nevertheless, the project was far from complete when the complaint was filed in mid-1985, and the building is alleged to be a gutted shambles without windows, air conditioning, plumbing, fire alarms, security, or protection from the elements. Although defendants had caused the partnership to incur liabilities of about $10.2 million by November 30, 1984, only about $500,000 appeared to have been spent for construction work, and about $4 million more was still needed to complete the project. Moreover, despite representations in the Offering Memorandum that the property would be converted to artist-in-residence quarters, defendants knew that residential use was contrary to the zoning regulations and that a variance for such use had in fact been denied prior to the offering.
 
 
 7
 Other promises in the Offering Memorandum and the Partnership Agreement were not fulfilled. The general partners failed to provide the limited partners with regular accountings and reports on the financial condition of the partnership and the status of the construction project. The general partners also continued to collect management fees from the partnership and sold additional limited partnership interests without amending the Certificate of Limited Partnership or the Partnership Agreement and without notice to or the consent of the plaintiffs.
 
 
 8
 Broadway Associates defaulted on the consolidated loan on June 30, 1984, causing Central to begin default proceedings against the partnership in New York state court. The partnership's other loan of $3 million from Morgan was kept out of default only because the limited partners began making pro rata interest payments on behalf of the partnership. Finally, the general partners entered into a "secret" agreement to sell their partnership interests to F.M. Capital Corp. ("F.M. Capital"). This agreement afforded substantial benefits to the general partners--cash payments of $550,000 from the partnership and relief from all liabilities and expenses--while the limited partners stood to incur $2 million in losses and the further dilution of their equity interest.
 
 
 9
 On May 30, 1985, plaintiffs filed their complaint in the Southern District of New York. The complaint alleged violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5; and of Sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. Secs. 77l(2) and 77q(a). It also alleged numerous pendent state law claims, including common law fraud, breach of fiduciary duty, breach of contract, fraud under the New York General Business Law Secs. 352-c and 352-e, and violations of various sections of the New York Partnership Law. In addition to monetary damages, the complaint sought preliminary and permanent mandatory injunctive relief to compel defendants to vacate the partnership premises and to refrain from acting on behalf of the partnership, to stay the effect of the agreement between the general partners and F.M. Capital, to enjoin defendants from preparing or filing amended partnership tax returns, and to appoint a committee of plaintiff limited partners to take control of the partnership assets.
 
 
 10
 After three days of hearings, the district court denied the application for injunctive relief on the ground that plaintiffs had not demonstrated irreparable injury. The court noted that, "[t]aking plaintiffs' allegations at face value, no allegation implicates any potential damage other than plaintiffs' investment liability." Memorandum Opinion at 5 (Aug. 7, 1985). The court preliminarily accepted jurisdiction over the Section 10(b) and Rule 10b-5 claims as being within its exclusive jurisdiction. 15 U.S.C. Sec. 78aa (1982). However, it dismissed all other claims pursuant to the Partnership Agreement's forum-selection clause, which provided that all actions arising out of the agreement were to be brought in a New York state court.
 
 
 11
 Defendants subsequently moved to dismiss the outstanding Section 10(b) claims for failure to plead fraud with particularity as required by Fed.R.Civ.P. 9(b), and for failure to state a claim under Fed.R.Civ.P. 12(b)(6). On January 2, 1986, 109 FRD 558, the district court dismissed the complaint on Rule 9(b) grounds. Judge Carter did not grant leave to amend.DISCUSSION
 
 
 12
 On appeal, the limited partners challenge the dismissal of their Section 10(b) claims, the denial of leave to amend, the dismissal of their state law claims based on the forum-selection clause, and the denial of preliminary injunctive relief. We agree with the district court that the state law claims had to be dismissed in light of the forum-selection clause. However, our review persuades us that although many of the claims in the complaint do not satisfy the requirements of either Rule 9(b) or Rule 12(b)(6), there are specific allegations of Section 10(b) violations that should not have been dismissed. Further, the limited partners should have been allowed to amend their complaint. Appellants' remaining claims are without merit.
 
 1. Sufficiency of the Complaint
 
 13
 Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," an exception to the generally liberal scope of pleadings allowed by Rule 8, Fed.R.Civ.P. See Ross v. A.H. Robins Co., 607 F.2d 545, 557 (2d Cir.1979), cert. denied, 446 U.S. 946 (1980).
 
 
 14
 In dismissing the allegations of Section 10(b) violations for failure to meet the requirements of Rule 9(b), the district court noted the complaint's failure to connect allegations of fraudulent representations to particular defendants and to allege specific facts to support the claims of fraud. These shortcomings are clearly evident in many of plaintiffs' claims.
 
 
 15
 With regard to connecting particular representations to particular defendants, the complaint alleges numerous representations attributed only to the "defendants." For example, paragraph 68 of the complaint alleges: "During the course of the project, defendants continually misrepresented to the plaintiffs and the class the cost, status and expected completion date of the project." Paragraph 84 alleges: "Upon information and belief, defendants made oral and written representations to plaintiffs and the class regarding their returns on investment and cash and tax benefits apart from the Offering Memorandum. These further representations occurred, upon information and belief, both before the Closing and thereafter in connection with further solicitation of limited partners."[1] Such allegations, which fail to specify the time, place, speaker, and sometimes even the content of the alleged misrepresentations, lack the "particulars" required by Rule 9(b). See, e.g., Denny v. Barber, 576 F.2d 465, 469 (2d Cir.1978); Segal v. Gordon, 467 F.2d 602, 608 (2d Cir.1972).
 
 
 16
 We also agree with the district court that many allegations of fraud are entirely conclusory and unsupported by assertions of facts. For example, the complaint alleges at paragraph 114 that defendants made oral and written misrepresentations of their net worth and their ability to make the partnership business successful. Yet plaintiffs do not state facts on which these allegations are based; there is no elaboration on what representations of net worth were made or why those representations were false. Even the allegations at paragraph 73 that defendants concealed their knowledge that a zoning variance on the property had been denied does not state the factual circumstances of the denial, matters of which plaintiffs should have knowledge. Because such statements do not "allege with some specificity the acts constituting the fraud," Rodman v. Grant Foundation, 608 F.2d 64, 73 (2d Cir.1979), they were vulnerable to a motion to dismiss under Rule 9(b).[2]
 
 
 17
 Some allegations of the complaint, however, do meet the specificity requirements of Rule 9(b). Reference to the Offering Memorandum satisfies 9(b)'s requirements as to identification of the time, place, and content of the alleged misrepresentations. See, e.g., Klein v. Computer Devices, Inc., 591 F.Supp. 270, 279 (S.D.N.Y.1984); Somerville v. Major Exploration, Inc., 576 F.Supp. 902, 911 (S.D.N.Y.1983). Furthermore, no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question. See, e.g., Somerville, 576 F.Supp. at 911; Pellman v. Cinerama, Inc., 503 F.Supp. 107, 111 (S.D.N.Y.1980).
 
 
 18
 Many allegations grounded in the Offering Memorandum are based on specific facts. For example, plaintiffs assert that although the Offering Memorandum represented that the general partners would make capital contributions to the partnership of $385,000, the general partners actually contributed only approximately $80,000. Plaintiffs also claim that the Offering Memorandum falsely represented that the cost of the renovation would be $4.5 million, when in fact liabilities for the still incomplete project already exceed $10.2 million. Thus, some claims grounded in the Offering Memorandum are sufficiently pleaded to pass muster under Rule 9(b).
 
 
 19
 The district court dismissed the complaint under Rule 9(b), rather than Rule 12(b)(6), because it believed that the faulty state of the pleadings permitted only speculation as to whether plaintiffs stated a claim for which relief could be granted. The court added, however, that "most of the activities alleged are not even colorably within the purview of Sec. 10(b) and SEC Rule 10b-5, but fall within the realm of poor prediction or mismanagement." Memorandum Opinion at 4 (Jan. 2, 1986). See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 479 (1977) (Section 10(b) not applicable to corporate mismanagement or a breach of fiduciary duty). We read this remark as implying that a remand by us without a discussion of whether the complaint states a claim for relief might quickly result in another dismissal and appeal. To avoid that potentially wasteful result, we address the complaint's sufficiency under Rule 12(b)(6).
 
 
 20
 To state a claim under Section 10(b), a complaint must allege material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security. Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976). The district court was quite correct, therefore, in stating that allegations of mismanagement do not state a claim under Section 10(b). See Santa Fe Industries, 430 U.S. at 479. However, making a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate Section 10(b) where the promise is part of the consideration for the transfer of securities. Pross v. Katz, 784 F.2d 455, 457 (2d Cir.1986); McGrath v. Zenith Radio Corp., 651 F.2d 458, 466 (7th Cir.), cert. denied, 454 U.S. 835 (1981); A.T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir.1967). Such a promise, however, must encompass particular actions and be more than a generalized promise to act as a faithful fiduciary. Pross, 784 F.2d at 458.
 
 
 21
 The sale of limited partnership interests in the Broadway Associates property was a sale of securities under Section 10(b). Mayer v. Oil Field Systems Corp., 721 F.2d 59, 65 (2d Cir.1983). The limited partners allege that defendants made various representations with regard to future actions in the Offering Memorandum. Under Pross, whether such allegations state a claim under Rule 12(b)(6) turns on whether those representations involved specific promises by the general partners to perform particular acts that they did not intend to carry out or knew could not be carried out.
 
 
 22
 An examination of the complaint reveals some claims that fall within this category. Plaintiffs allege that the Offering Memorandum represented the following: that the general partners would make an initial capital contribution of $385,000 and guarantee the $4.5 million construction loan, that at least one of the general partners had maintained and would continue to maintain its net worth at a level sufficient to ensure the partnership's profitability,[3] that the general partners would collect management fees from the partnership for only one year, and that no assignment or transfer of the general partners' interest in the partnership could occur without notice to and consent of the limited partners. Plaintiffs also allege that these promises were not kept: the general partners contributed only approximately $80,000 and did not guarantee the loan; the general partners did not have and never had the net worth necessary to particpate in the limited partnership; the general partners continued to collect management fees for well over one year; and the general partners entered into an agreement to transfer their partnership interests to F.M. Capital without the knowledge and consent of the limited partners.
 
 
 23
 While the failure to carry out a promise made as consideration for a sale of securities may be an element of a Section 10(b) claim, that failure does not constitute fraud if the promise was made with a good faith expectation that it would be carried out. Cf. Ernst & Ernst, 425 U.S. 185. However, in the instant case, plaintiffs also allege that these promises were known by defendants to be false when made. Plausible allegations that defendants made specific promises to induce a securities transaction while secretly intending not to carry them out or knowing they could not be carried out, and that they were not carried out, are sufficient under Pross to state a claim for relief under Section 10(b).
 
 
 24
 The other claims based on the Offering Memorandum do not state a claim for relief under Section 10(b). Plaintiffs allege that the Offering Memorandum contained intentional misrepresentations as to the potential cash and tax benefits of the partnership. However, the Offering Memorandum made it quite clear that its projections of potential cash and tax benefits were "necessarily speculative in nature" and that "[n]o assurance [could] be given that these projections [would] be realized." Indeed, the Offering Memorandum warned prospective investors that "[a]ctual results may vary from the predictions and these variations may be material." We are not inclined to impose liability on the basis of statements that clearly "bespeak caution." Polin v. Conductron Corp., 552 F.2d 797, 806 n. 28 (8th Cir.), cert. denied, 434 U.S. 857 (1977) (quoted approvingly in Goldman v. Belden, 754 F.2d 1059, 1068 (2d Cir.1985)).
 
 2. Leave to Amend
 
 25
 Complaints dismissed under Rule 9(b) are "almost always" dismissed with leave to amend. 2A J. Moore & J. Lucas, Moore's Federal Practice, p 9.03 at 9-34 (2d ed. 1986). See also Yoder v. Orthomolecular Nutrition Institute, Inc., 751 F.2d 555, 562 (2d Cir.1985). In cases where such leave has not been granted, plaintiffs have usually already had one opportunity to plead fraud with greater specificity, see, e.g., Armstrong v. McAlpin, 699 F.2d 79, 93-94 (2d Cir.1983); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir.1982); Denny v. Barber, 576 F.2d at 470-71, or the defective allegations were made after full discovery in a related case, Billard v. Rockwell International Corp., 683 F.2d 51, 57 (2d Cir.1982). In opposing defendants' motion to dismiss, plaintiffs specifically requested leave to amend should dismissal be granted, and we believe the dismissal of the complaint without granting leave to amend was an abuse of discretion. Foman v. Davis, 371 U.S. 178, 182 (1962). See also Fed.R.Civ.P. 15(a); Kaster v. Modification Systems, Inc., 731 F.2d 1014, 1018 (2d Cir.1984). Because plaintiffs must be allowed an opportunity to amend to remedy deficiencies under Rule 9(b), we believe they may also amend the complaint in light of our discussion of sufficiency under Rule 12(b)(6).
 
 
 26
 However, leave to amend should be restricted to allegations of misrepresentations in connection with inducing investments in the partnership, whether or not in the Offering Memorandum. Allegations that relate to the mismanagement of the project cannot survive a Rule 12(b)(6) motion even if made with more particularity. Amendments relating to projections or expectations offered to induce investments must allege particular facts demonstrating the knowledge of defendants at the time that such statements were false.
 
 3. The Forum-Selection Clause
 
 27
 Paragraph 22 of the Broadway Associates Limited Partnership Agreement provides that in all actions arising out of the Partnership Agreement or breach thereof, the parties agreed to confer exclusive jurisdiction upon the Supreme Court of New York, New York County.[4] Pursuant to this provision, the district court dismissed the limited partners' claims based on state and common law and the Securities Act of 1933.[5]
 
 
 28
 Forum-selection clauses are not disfavored in the law. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 518 (1974); The Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972). As Judge Friendly noted in AVC Nederland B.V. v. Atrium Investment Partnership, 740 F.2d 148, 156 (2d Cir.1984), "[t]here can be nothing 'unreasonable and unjust' in enforcing such an agreement; what would be unreasonable and unjust would be to allow one of the [parties] to disregard it."[6] Plaintiffs, sophisticated investors who warranted their familiarity with the agreement, have failed to offer any reason for us not to enforce the forum-selection clause in this case.
 
 4. Denial of Preliminary Injunctive Relief
 
 29
 In order to obtain a preliminary injunction, plaintiffs were required to show both irreparable harm and either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the moving party. Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam). In denying plaintiffs' preliminary injunction request, the district court found that plaintiffs' allegations implicated only the potential loss of their investment--economic injury that, because it does not constitute irreparable harm, is insufficient to justify the granting of a preliminary injunction. Sperry International Trade, Inc. v. Government of Israel, 670 F.2d 8, 12 (2d Cir.1982); KMW International v. Chase Manhattan Bank, N.A., 606 F.2d 10, 14-15 (2d Cir.1979).
 
 
 30
 The decision to grant or deny preliminary injunctive relief rests in the sound discretion of the district court, and will not be disturbed on appeal unless it results from an abuse of judicial discretion. Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32 (1975); Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 315 (2d Cir.1982). The issuance of injunctive relief at this time would be justified only to prevent further mismanagement of the project. Because the claims of mismanagement have been dismissed pursuant to the forum-selection clause, we believe that injunctive relief must be pursued in the designated state court.
 
 CONCLUSION
 
 31
 The judgment of the district court is affirmed in part, reversed in part, and remanded.
 
 
 
 [1]
 Allegations of fraud cannot ordinarily be based "upon information and belief," except as to "matters peculiarly within the opposing party's knowledge." Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 379 (2d Cir.1974), cert. denied, 421 U.S. 976 (1975). To satisfy Rule 9(b) in the latter instance, the allegations must be accompanied by a statement of the facts upon which the belief is founded. Segal v. Gordon, 467 F.2d 602, 608 (2d Cir.1972). Many of plaintiffs' allegations based upon information and belief fail to meet these requirements. Some indeed appear to relate to matters peculiarly within plaintiffs', rather than defendants', knowledge. See, e.g., Complaint at paragraphs 84, 98. Others are unsupported by any statement of facts upon which the belief is founded. See, e.g., Complaint at paragraphs 50, 67
 
 
 [2]
 Other examples of allegations properly dismissed for failure to plead fraud with particularity are at paragraphs 45, 50, 51, 55, 62, 66, 67, 81-84, 98, and 109
 
 
 [3]
 This claim will have to be pled with more particularity to meet Rule 9(b)'s requirements upon remand
 
 
 [4]
 Paragraph 22 of the Partnership Agreement stated in full:
 
 
 [22]
 Commencement of Actions or Proceedings
 Any action or proceeding brought by a party hereto against any other party and arising out of this Agreement or any breach thereof, may be commenced by the service of process in the same manner as a notice may be served under this Agreement and the parties hereby confer exclusive jurisdiction in any such action or proceeding, upon the Supreme Court of the State of New York, County of New York. This Agreement shall be construed in accordance with New York law.
 
 
 [5]
 The federal courts have concurrent jurisdiction with the state courts over claims arising under the Securities Act of 1933. Section 22(a) of the Securities Act of 1933, 15 U.S.C. Sec. 77v(a) (1982)
 
 
 [6]
 Plaintiffs' attempts to distinguish these cases as limited to the international context or as grounded in the policies of arbitration are unavailing. As we stated in Bense v. Interstate Battery System of America, Inc., 683 F.2d 718, 721 (2d Cir.1982), "although Scherck and The Bremen both arose in an international context, we see no reason why this should preclude the application of The Bremen Court's reasoning to domestic suits." Moreover, both AVC Nederland and Bense involved judicial, rather than arbitral, forums