98 F.3d 2
 65 USLW 2320, Fed. Sec. L. Rep. P 99,335
 Marilyn OLKEY; Lawrence Berger, Cetinna Camenzuli; Lois F.
Dehaven; Gary Pshena; Janis Pshena; Herbert N. Feldstein;
Charles Kornberger; Marcella Levy; Michael W. Moran;
Milton V. Firestone; Alan Wolf; Leonard Newberger; Robert
Perocchia; Madeline Middlemark; Direct Reproduction Corp.,
Superimposed Pension Trust # 3 Pension Plan Dated May 12,
1992; Robert Rattner; Norman Urkowitz; Alvin Goldstein;
Harvey Makofsky; David Masucci, on behalf of themselves and
all others similarly situated, Plaintiffs-Appellants,
v.
HYPERION 1999 TERM TRUST, INC.; Kenneth C. Weiss; Lewis S.
Ranieri; Garth Marston; Rodman L. Drake; Leo M. Walsh,
Jr.; Patricia A. Sloan; David R. Odenath, Jr.; Paul V.
Ippolito; Smith Barney, Harris Upham & Co., Inc.; Kidder
Peabody & Co., Inc.; Merrill Lynch & Company; Oppenheimer
& Co.; Prudential Securities, Inc.; Dain Bosworth, Inc.,
defendants Smith Barney, Harris Upham, Kidder Peabody,
Merrill Lynch, Oppenheimer, Prudential, and Dain Bosworth
are sued herein individually and as Representatives of
defendant Underwriter Class; Harry E. Petersen, Jr.;
Advest, Inc.; Crowell, Weedon & Co.; Hyperion 1997 Term
Trust, Inc.; Hyperion 2002 Term Trust, Inc.; PaineWebber
Incorporated; Hyperion Capital Management, Inc.; Alan M.
Mandel, Defendants-Appellees.
 No. 1023, Docket 95-7823.
 United States Court of Appeals,
Second Circuit.
 Argued March 27, 1996.
Decided Oct. 15, 1996.
 
 Roger W. Kirby, New York City (Irving Malchman, Jeffrey H. Squire, Ira M. Press, Kaufman Malchman Kirby & Squire, LLP, New York City, Henry Paul Monaghan, New York City, of counsel), for Plaintiffs-Appellants.
 Michael J. Malone, New York City (Steven B. Carlin, Paul A. Straus, Elizabeth Swire Falker, Battle Fowler LLP, New York City, of counsel), for Defendants-Appellees Hyperion Capital Management, Inc., Lewis S. Ranieri, Kenneth C. Weiss, David R. Odenath, Jr., Patricia Sloan and Alan M. Mandel.
 Alan J. Hruska, New York City (Gerald A. Ford, David A. Kotler, Gregory E. Birkenstock, Cravath, Swaine & Moore, New York City, of counsel), for Defendants-Appellees Hyperion 1997 Term Trust, Inc., Hyperion 1999 Term Trust, Inc., Hyperion 2002 Term Trust, Inc., Rodman L. Drake, Garth Marston, Harry E. Petersen, Jr. and Leo M. Walsh, Jr.
 Charles A. Gilman, New York City (David G. Januszewski, Jonathan R. Donnellan, Cahill, Gordon & Reindel, a partnership including a professional corporation, New York City, of counsel), for Defendant-Appellee Underwriter Class.
 Before: NEWMAN, Chief Judge, OAKES, and PARKER, Circuit Judges.
 PARKER, Circuit Judge:
 
 
 1
 Plaintiffs Marilyn Olkey et al., a group of investors, brought a class action against Hyperion 1999 Term Trust, Inc. et al. seeking damages for fraud in issuing and using prospectuses to market mortgage-backed securities, in violation of Sections 11, 12(2), and 15 of the Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. §§ 77k(a), 77l(2), and 77o; and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and 15 U.S.C. § 78t(a). They also allege common law fraud. The defendants moved for dismissal under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. In a judgment dated July 14, 1995, the district court of the Southern District of New York (Michael B. Mukasey, Judge ) dismissed the suit under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In re Hyperion Sec. Litig., No. 93 Civ. 7179(MBM), 1995
 
 
 2
 WL 422480. The court held that a reasonable investor would not have been misled by the prospectuses because, on their face, they contained no material misstatements or omissions of fact. The court found the prospectuses accurately represented the investment strategy and provided sufficient explanation of risk. The plaintiffs appeal. We affirm the 12(b)(6) dismissal because the plaintiffs' claims are contradicted by the prospectuses on their face and therefore no set of additional facts could prove the plaintiffs' claims.
 
 I. BACKGROUND
 
 3
 The plaintiffs are a group of more than twenty investors who purchased common stock in three investment companies--Hyperion 1997 Term Trust, Inc., Hyperion 1999 Term Trust, Inc., and Hyperion 2002 Term Trust, Inc. (collectively, "the Trusts"). The investors sue on behalf of themselves and a class of similarly situated investors. The class period extends from June 1992 when the registration statement for Hyperion 1999 became effective and the initial public offering commenced, until October 1993, the date on which the defendants announced that each Hyperion Trust was reducing its dividend. The defendants include the Trusts, Hyperion Capital Management, which served as the investment advisor and administrator of the Trusts, individuals who served as officers or directors of the Trusts or Hyperion Capital, and nine underwriters who participated in the Hyperion offerings.
 
 
 4
 The Trusts are closed-end investment companies, so they are not obligated to redeem shares bought by investors; investors must resell their shares on the secondary market. The Trusts were formed to invest primarily in mortgage-backed securities. The securities comprising the Trusts included interest-only strips (IOs) of mortgages, which tend to go up with interest rates, and mortgage-backed securities, which tend to go down when interest rates go up. IOs and mortgage-backed securities were intended to balance each other, to serve as a hedge against interest rate changes. Interest rates subsequently declined to historic lows, and the value of the trusts declined.
 
 
 5
 The plaintiffs alleged that the prospectuses misled investors by indicating that securities would be selected to achieve a balance such that, as interest rates rose and fell, the value and earnings of the Trusts would remain stable. The plaintiffs contended that this was a misrepresentation because the defendants actually invested in a combination of securities which required rising interest rates to succeed. The plaintiffs further alleged that the defendants failed to disclose the limitations of their hedging strategy, namely, its vulnerability to decreasing interest rates, and that therefore the prospectuses and registration statements misrepresented both the investment strategy of the trust and the risks involved. Finally, the plaintiffs claimed that the defendants misrepresented the riskiness of the Trusts in the presentations, known as roadshows, which they gave to potential brokers.
 
 
 6
 The plaintiffs claimed that these alleged misrepresentations violate the following securities laws: (1) Section 11(a) of the 1933 Act, 15 U.S.C. § 77k(a), which makes any signer, officer of the issuer or underwriter liable for a registration statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact"; (2) section 12(2) of the 1933 Act, 15 U.S.C. § 77l(2), providing for liability for making a securities offering "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading"; (3) section 15 of the 1933 Act and section 20(a) of the 1934 Act, 15 U.S.C. § 77o and § 78t(a), providing for liability of controlling persons; (4) section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibiting fraudulent, material misstatements or omissions in connection with the sale or purchase of a security, see Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir.1986).
 
 
 7
 The defendants moved to dismiss the claim pursuant to the Federal Rules of Civil Procedure, on two grounds--failure to state a claim upon which relief can be granted under Rule 12(b)(6), and failure to state a fraud claim with sufficient particularity under Rule 9(b).
 
 
 8
 The district court granted the motion to dismiss the suit pursuant to Rule 12(b)(6), on the ground that the investment strategy and risks were fully revealed on the face of the prospectuses. 1995 WL 422480, at * 8. While acknowledging that the roadshows were "more optimistic about risks and returns" than the prospectuses, Judge Mukasey reasoned that reasonable investors would not have relied on oral assurances when they were "contradicted by specific disclosures in the prospectuses." Id. at * 7-8. The court dismissed the claim without leave to replead because the plaintiffs had already amended their complaint twice. Id. at * 8. The court did not reach the motion to dismiss under Rule 9(b). It denied a motion for reargument. In re Hyperion Sec. Litig., No. 93 Civ. 7179(MBM), 1995 WL 539634 (S.D.N.Y. Sept. 11, 1995). The plaintiffs appeal.
 
 
 9
 The plaintiffs offer the following argument: The Trusts were based upon a failed bet that interest rates would rise. The riskiness of this bet was disproportionate to the level of return promised to investors; promised profits were small in comparison to the risk and potential size of losses. This bet was not disclosed to investors. If it had been disclosed, the investors would not have bought shares in the trust because no reasonable investor would accept low return for high risk. The cautionary language in the prospectuses is too general and generic to have alerted investors of the actual risks they faced and should therefore be ignored as boilerplate. These warnings do not mention risk to capital, to the total value of the portfolio rather than merely components of it. Read as a whole, each prospectus gave the false impression of an attempt to pursue a balanced strategy to minimize risk. In fact, the Trusts speculated on high interest rates. The roadshows compounded the false impression of balance and safety.
 
 II. DISCUSSION
 
 10
 We review de novo the district court's dismissal of the complaint under Rule 12(b)(6) and draw all reasonable inferences in the plaintiff's favor. Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 699 (2d Cir.1994). The complaint may be dismissed under Rule 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." I. Meyer Pincus & Assoc. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir.1991). The allegations must be well-pleaded. Papasan v. Allain, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986); Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991).
 
 
 11
 It is undisputed that the prospectuses must be read "as a whole," see, e.g., McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir.1990), cert. denied, 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). It is further undisputed that the "central issue ... is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities]," id. A prospectus will violate federal securities laws if it does not disclose "material objective factual matters," or buries those matters beneath other information, or treats them cavalierly. Pincus, 936 F.2d at 762.
 
 
 12
 The prospectuses included the following assurances of balancing:
 
 
 13
 [T]he Adviser believes that it will be able to manage the composition of the Trust's portfolio in such a manner that any decreases in the value of securities as a result of changes in interest rates will be offset by increases in the value of other securities whose value moves in the opposite direction in response to changes in interest rates, thereby avoiding the realization of capital losses which are not offset by capital gains over the life of the Trust....
 
 
 14
 Prospectus for Hyperion 1997 Term Trust, Inc., at 19 (Oct. 23, 1992) ("1997"); Prospectus for Hyperion 1999 Term Trust, Inc., at 16 (June 18, 1992) ("1999"); Prospectus for Hyperion 2002 Term Trust, Inc., at 19 (Oct. 23, 1992) ("2002").
 
 
 15
 The Trust's investment in IOs, when combined with other instruments in the Trust's portfolio, is expected to aid the Trust in its attempt to preserve capital. The values of IOs tend to increase in response to changes in interest rates when the values of these other Mortgage-Backed Securities and of Zero Coupon Securities are decreasing, and to decrease when the values of such other instruments are increasing. While the Adviser has no control over changes in levels of interest rates, it has designed the initial composition of the Trust's portfolio and will manage the portfolio on an ongoing basis in an attempt to minimize the impact of changes in interest rates on the net asset value of the portfolio.
 
 
 16
 1997 at 4; 1999 at 4; 2002 at 4. See 1997 at 8-9; 1999 at 6-7; 2002 at 8. Despite these assurances of hedging, we agree with the district court, 1995 WL 422480, at * 7, that the prospectuses when read in their entirety are not overly sanguine but instead "bespeak caution," Pincus, 936 F.2d at 763; Luce, 802 F.2d at 56. The assurances were balanced by extensive cautionary language. The plaintiffs seek to have all of the cautionary language disregarded as boilerplate, but it is too prominent and specific to be disregarded. The prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed. A reasonable investor could not have read the prospectuses without realizing that, despite the use of balancing[1] in an attempt to minimize the impact of fluctuating interest rates, a significant downturn in interest rates could decrease the value of the Trusts and decrease earnings. The prospectuses included the following warnings about mortgage-backed securities:
 
 
 17
 The investment characteristics of Mortgage-Backed Securities differ from traditional debt securities.... These differences can result in significantly greater price and yield volatility than is the case with traditional debt securities. As a result, if the Trust purchases Mortgage-Backed Securities at a premium, a prepayment rate that is faster than expected will reduce both the market value and yield to maturity from that which was anticipated....
 
 
 18
 1997 at 7-8; 1999 at 6; 2002 at 7.
 
 
 19
 Because of the effect that changes in interest rates may have on prepayment rates, changes in interest rates may have a greater effect on the value of Mortgage-Backed Securities than is the case with more traditional fixed income securities.
 
 
 20
 1997 at 9; 1999 at 7; 2002 at 8-9.
 
 
 21
 Amounts available for reinvestment by the Trust are likely to be greater during a period of declining interest rates due to increased prepayments and, as a result, likely to be reinvested at lower interest rates than during a period of rising interest rates. Most Mortgage-Backed Securities in which the Trust may invest, like other fixed income securities, tend to decrease in value as a result of increases in interest rates but may benefit less than other fixed income securities from declining interest rates because of the risk of prepayment.
 
 
 22
 1997 at 13; 1999 at 10; 2002 at 13. In a section set apart under the heading "Risk Factors," the prospectuses even suggested the possibility of precisely the scenario that occurred--namely, interest rates fell, and, because prepayments increased significantly and because of the Trusts' use of leverage, the Mortgage-Backed Securities were an insufficient hedge against the decline in value of the IO strips:
 
 
 23
 A significant decline in interest rates could lead to a significant decrease in the Trust's net income and dividends....
 
 
 24
 ... [T]he Trust may be unable to distribute at least $10.00 per share ... on [its termination date]....
 
 
 25
 The market prices of [most mortgage-backed securities] may be more sensitive to changes in interest rates than traditional fixed income securities. While the Trust will seek to minimize the impact of such volatility on the net asset value of the Trust's assets, there can be no assurance it will achieve this result. In addition, in the case of an IO, prepayment of the underlying mortgages may result in the Trust's not recouping a portion of its initial purchase price in addition to the loss of interest income.... To the extent that the Trust utilizes leverage, the impact ... of volatility on the Trust's income and net asset value will be magnified.
 
 
 26
 1997 at 13-14; 1999 at 10-11; 2002 at 13-14 (paragraph headings omitted). See 1997 at 32; 1999 at 28; 2002 at 31. The prospectuses stated the intent to use leverage and noted that leverage would "exaggerate the decline in the net asset value or market price of the Shares." 1997 at 13; 1999 at 10; 2002 at 13. See also 1997 at 33-34; 1999 at 29-30; 2002 at 33.
 
 
 27
 The prospectuses repeatedly warned of risk to the entire portfolio:
 
 
 28
 [T]he market value of the Trust's portfolio ... [is] dependant on market forces not in the control of the Adviser.
 
 
 29
 1997 at 9; 1999 at 7; 2002 at 9.
 
 
 30
 [T]he Trust may be unable to distribute to its shareholders at the end of the Trust's term an amount equal to at least $10.00 for each Share then outstanding.
 
 
 31
 1997 at 19; 1999 at 16; 2002 at 19.
 
 
 32
 No assurance can be given that the Trust will achieve its investment objectives, and the Trust may return less than $10.00 per Share. A significant decline in interest rates could lead to a significant decrease in the Trust's net income and dividends while a significant rise in interest rates could lead to only a moderate increase in the Trust's net income and dividends. Changes in interest rates will also lead to changes in the Trust's net asset value.
 
 
 33
 1997 at 2; 1999 at 2; 2002 at 2. The second sentence of this passage--positioned on the second page of each prospectus such that no reasonable reader could miss it--unequivocally states that a drop in interest rates could significantly reduce net income and dividends. The next sentence by itself is vague--it does not state whether changes in interest rates could reduce net asset value, only that they will change net asset value. But the juxtaposition of the two sentences creates an unmistakable inference that a drop in interest rates could decrease net asset value. The two sentences combined elaborate the first sentence by spelling out the condition under which the Trusts could fail to return the investor's money--a significant drop in interest rates.
 
 
 34
 As stated above, the complaint alleges that investors were misled into believing that their investment would be balanced to remain stable as interest rates rose and fell, when in fact there was an undisclosed bias toward rising interest rates. (The plaintiffs cite, as if it were a smoking gun, the defendants' post-offering report stating that the Trusts were designed "with a bias toward a rising interest rate environment," Hyperion 1999 Term Trust Semi-Annual Report (May 31, 1993).) The complaint also alleges failure to disclose the risk that falling interest rates could diminish asset value and dividends. The passages quoted above dispose of both of these allegations. While we agree that the prospectuses contain no specific statement that there was a bias in favor of rising interest rates, we find that the prospectuses implicitly and clearly communicated such a bias.
 
 
 35
 Reasonable investors in the Trusts would hope to preserve capital and earn income. They were informed that the nature of the investment was such that fluctuating interest rates could affect the investment's value. They were told that different types of securities would be affected differently by rising or falling rates and that hedging would be used to minimize those effects. And they were told that a significant decline in interest rates could lead to significant decreases in income and asset values while significant rate increases could lead to only moderate increases in income and asset value. Thus, they were told that the value of losses if rates dropped could exceed the value of profits if rates rose. The only way reasonable investors would then invest in the Trusts would be if they believed that the probability of rates rising exceeded the probability of interest rates dropping.
 
 
 36
 This is the very bias which plaintiffs claim was not disclosed. Reasonable investors would have to be aware that they were risking low returns and erosion of capital if there was a significant drop in interest rates, which is precisely what occurred. Any reasonable investor would have to conclude that the investment objectives could only be achieved here if interest rates rose more than they fell. No reasonable investor could have relied on perfect balancing because that was not promised.
 
 
 37
 The dissent believes that this claim should proceed because the fund managers failed to disclose the fact that they were betting on rising interest rates and, therefore, "invested disproportionately in instruments that would benefit from rising rates." 98 F.3d at 9. But, the dissent also acknowledges, as it must, that if all that the plaintiffs are claiming is that the fund managers turned out to be "less skillful at balancing their portfolios than the investors hoped[,] ... their suit would be properly dismissed." 98 F.3d at 11. In fact, that is exactly what is being claimed here.
 
 
 38
 As the dissent indicates, the appellants "do not claim that no balancing occurred; clearly there was some diversification in the portfolios." The prospectuses reveal that a combination of mortgage-backed investments and IO strips were used in an attempt to minimize the impact of interest rate fluctuations. However, the appellants say too much emphasis was placed on IOs because the investment managers believed that interest rates would likely rise.
 
 
 39
 Every attempt at balancing, of course, must necessarily involve the selection of a mix of investments based in part upon an assessment of what might happen with interest rates; attempting to balance investments in interest-rate sensitive securities without taking prospective rates into account would surely be foolhardy. The plaintiffs are displeased that the fund managers made what turned out to be the wrong assumptions about interest rates while attempting to balance the portfolio. This is not something upon which a fraud claim can be based. Disclosure of the specific reasons for making the investment choices that were made is not required by the Securities laws. The risks involved, in the event that incorrect choices were made or interest rates fell, were appropriately and fully disclosed.
 
 
 40
 Despite that, plaintiffs now claim that balancing was not as skillfully done as it should have been. They claim that another set of investment choices should have been made, based upon a different conception of what interest rates would likely do. It is hardly a sound argument, as the dissent suggests, 98 F.3d at 12, to say that some other unspecified income funds performed better. That is only to say in hindsight that the managers of those funds turned out to be more skillful in their predictions.
 
 
 41
 It should also be noted that the alleged undisclosed bias had no direct relationship to the losses claimed to have been incurred. The losses resulted from an extraordinary drop in interest rates. The plaintiffs claim that the failure to disclose the bias toward rising rates masked the fact that this was a high risk/low return investment that they would not have purchased if they had known. The risk, however, was that interest rates would fall or not rise more than they fell. That risk was fully and explicitly disclosed. Therefore, there is no causal relationship between losses claimed to have been suffered and any risk factor not clearly disclosed in the prospectuses.
 
 
 42
 The plaintiffs repeatedly argue that all of the warnings in the prospectuses should be ignored as boilerplate. Yet, they offer no serious rationale as to why a reasonable investor who was reading the prospectuses would consider the warnings too generic to be taken seriously and, at the same time, would find the sections discussing the opportunities and protections enticingly specific. The plaintiffs conveniently dismiss as boilerplate anything in the prospectuses that undermines their argument.
 
 
 43
 The plaintiffs' sole rationale for doing this is that if the warnings are not dismissed as boilerplate, the prospectuses would be read as offering a low return, high risk investment, an impossibly unattractive investment. Hence, the fact, they argue, that the offerings did attract investors must mean that those (presumably reasonable) investors dismissed the cautionary language as boilerplate.
 
 
 44
 But any investment that turns out badly can appear to be--in hindsight--a low return, high risk investment. Not every bad investment is the product of misrepresentation. The fact that interest rates did not rise, and that therefore the Trusts for a period decreased in value as the prospectuses indicated they might, only shows that the investment may have turned out to be a bad one. To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted. See Friedman v. Mohasco Corp., 929 F.2d 77, 79 (2d Cir.1991). "It is in the very nature of securities markets that even the most exhaustively researched predictions are fallible." Kramer v. Time Warner Inc., 937 F.2d 767, 776 (2d Cir.1991). "Fraud by hindsight" alone will not sustain a complaint. Jackson, 32 F.3d at 703 (quoting Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978)).
 
 
 45
 The plaintiffs deny that they are bringing suit merely because they allege the investments turned out badly. They argue that no reasonable investor would seek only modest returns in the face of the risk of substantial losses, as such an offering would constitute a low return, high risk investment. The plaintiffs conclude that, since there could be no market for such an unattractive investment, prospective investors, reading each prospectus as a whole, necessarily dismissed the cautionary language as boilerplate.
 
 
 46
 This argument is meritless. Reasonable investors may find the promise of merely modest returns sufficient if they perceive the risk of substantial losses as sufficiently small. Low returns and a low or moderate risk of substantial loss do not equal a low return, high risk investment. The plaintiffs do not even attempt to give any rationale for why a belief at the time of the offerings in a low probability of interest rates dropping significantly would have been unreasonable. Nor do they assert that the defendants should have expected interest rates to drop, let alone to historic lows. See Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 177 (1st Cir.1994) (affirming summary judgment where plaintiffs "failed to adduce any facts" showing that defendants "could or should have been aware of" plaintiff's analysis at the time of offering).
 
 
 47
 Since a reasonable investor could have found the promise of moderate returns attractive despite the risk of substantial losses, there is no reason to dismiss the extensive and detailed cautionary language of the prospectuses as boilerplate. That language fully disclosed the risk of investment and was specific enough to warrant a reasonable investor's attention. This court has found language more general than that found in the Hyperion prospectuses to be sufficiently specific to warrant a Rule 12(b)(6) dismissal of a Rule 10b-5 claim. In Luce, the offering materials merely warned that potential benefits were "necessarily speculative," that "no assurance could be given that [they] would be realized," and "actual results may vary [materially] from the predictions." 802 F.2d at 56 (original brackets omitted). The Luce plaintiffs alleged that the defendants promised profits without warning that profits were not guaranteed, while the instant plaintiffs allege the defendants promised a secure investment without warning that preservation of capital was not guaranteed. Both plaintiffs' claims founder on the face of the offering materials.
 
 
 48
 Made cognizant by the Hyperion prospectuses of the risk posed by declining interest rates, reasonable investors purchased shares of the Trusts in the failed expectation that interest rates would rise. Their expectations were not deceptively manipulated but were simply unmet. The prospectuses contained no material misstatements or omissions of fact, and the plaintiffs fail to state a claim under either the 1933 or 1934 Acts, or under common law fraud.
 
 
 49
 Dismissal under Rule 12(b)(6) is appropriate because "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," Pincus, 936 F.2d at 762. Since the plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus, no set of additional facts could prove the plaintiffs' claims. Representations made by the defendants at the roadshows are immaterial since they are contradicted by plain and prominently displayed language in the prospectuses. See Dodds v. Cigna Securities, Inc., 12 F.3d 346, 351 (2d Cir.1993) ("Nor can a plaintiff rely on misleading oral statements to establish [a Section 10(b) ] unsuitability claim when the offering materials contradict the oral assurances"), cert. denied, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994); Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031-33 (2d Cir.1993). This court has consistently affirmed Rule 12(b)(6) dismissal of securities claims where risks are disclosed in the prospectus. See Jackson, 32 F.3d at 703 ("The prospectus fully disclosed the nature of the risks...."); Luce, 802 F.2d at 56 (offering materials made clear that benefits were not guaranteed, barring Rule 10b-5 claim); Pincus, 936 F.2d at 762 (prospectus made clear "exactly the 'fact' that [plaintiff] contends has been covered up," that shares would more likely trade at a discount than at a premium). The plaintiffs proffer no reasoned basis to dismiss as boilerplate the disclosure of risk contained throughout the prospectuses. "No amount of detail can save [the] complaint when the detail is based on flawed and unreasonable methodologies that lead to unsupported conclusions." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir.1994), cert. denied, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995).
 
 III. CONCLUSION
 
 50
 The district court properly dismissed this suit pursuant to Rule 12(b)(6). We affirm.
 
 JON O. NEWMAN, Chief Judge, dissenting:
 
 51
 I respectfully dissent. This stock fraud claim alleges that the issuers of closed-end funds, formed to invest primarily in mortgage-backed securities, represented that the portfolios would be "balanced," i.e., invested in debt instruments that respond in opposite directions to fluctuations in interest rates, and failed to disclose that the fund managers were in fact betting heavily on rising interest rates and invested disproportionately in instruments that would benefit from rising rates.[1] During the class period, interest rates declined 1.3 percentage points, contrary to the managers' expectation of a rise, and the three funds lost 8.5 percent, 10.5 percent, and nearly 25 percent, respectively, of their net asset values--an outcome that Barron's described as "far and away the worst showing of any closed-end bond fund." Complaint p 16. It is undisputed that several months after the prospectuses were issued and the appellants' investments were made, the chairman and chief executive officer of the issuer of the funds disclosed in a report to shareholders that the initial portfolio of one of the funds was designed "with a bias toward a rising interest rate environment."
 
 
 52
 The Court affirms the dismissal of the complaint for failure to state a claim on the ground that the allegedly undisclosed bias in favor of rising interest rates was in fact disclosed. Though the Court acknowledges that "the prospectuses contain no specific statement that there was a bias in favor of rising interest rates," 98 F.3d at 7, the Court nevertheless concludes that the prospectuses "implicitly and clearly communicated such a bias." Id. As evidence, the Court points to a passage in the prospectuses that disclosed that the decrease in net income and dividends that could result from a significant decline in interest rates could be greater than the increase in net income and dividends that could result from a significant rise in interest rates.[2]
 
 
 53
 The disclosure of these unequal consequences, the majority states, revealed the fund managers' bias toward rising interest rates because "[t]he only way reasonable investors would then invest in the Trusts would be if they believed that the probability of rates rising exceeded the probability of interest rates dropping." Id. (emphasis in original). To reach this conclusion before any evidence has been presented is contrary to Rule 12(b)(6) standards, which, as the Court recognizes, prohibit dismissal of a complaint unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." I. Meyer Pincus & Associates v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir.1991).
 
 
 54
 Not only is the Court's assumption about purchasers of fixed-income securities unsupported by any evidence, it is also highly likely to be incorrect. Many investors, alerted to the possibility that falling interest rates "could" decrease their return in a particular fixed-income fund to a greater extent than rising interest rates "could" raise their return, will nevertheless buy such a fund, if described as "balanced," in the expectation that the fund managers will try to balance their portfolio without a pronounced bias in favor of interest rate movements in either direction. They buy for stable return, slightly above government securities, and for preservation of capital.
 
 
 55
 To assert, especially in the absence of evidence, that the purchasers of the Hyperion funds bought in the expectation of rising rates is a proposition at least unsupported and in all likelihood unsupportable. It is possible that a few of the purchasers expected a slight increase in interest rates. Others who bought might have expected a slight decrease in interest rates. Regardless of their expectations as to rates, the repeated assurances that the funds would be "balanced" entitled all of them to believe that the funds would be so structured as to be relatively insulated from any significant rate movements.
 
 
 56
 The fixed-income securities market uses the term "convexity" to describe the degree to which the values of securities are subject to interest rate fluctuations. The term applies primarily to mortgage-backed securities with components of principal and interest. A security that decreases in value in a rising interest rate environment to a greater extent than it increases in value in a declining interest rate environment is said to have "negative convexity." Conversely, a security that increases in value in a declining interest rate environment to a greater extent than it decreases in value in a rising interest rate environment is said to have "positive convexity." A fund sold as "balanced" can reasonably be expected to try to select securities so that the fund's net convexity approaches zero. If a fund elects not to aim for as much balance as it can achieve and instead bets on a pronounced change in interest rates, it can be so structured (using significant amounts of IO strips) that its overall value will increase with a rise in interest rates or decrease with declining interest rates. That is what happened with the Hyperion funds. But a "balanced" fund, even one that acknowledges the possibility that significant rate decreases could harm more than significant rate increases could benefit, is still expected to structure the portfolio so that the net convexity is very slight. If the fund managers are secretly betting so heavily on rising interest rates by such a significant inclusion of leveraged IO strips that an interest rate decline will cause substantial decreases, they must say so. Their acknowledgement of the possible differing consequences of significantly decreasing and increasing rates does not reveal that their investment strategy is contrary to what would reasonably be expected of a "balanced" fund.
 
 
 57
 Of course, the investors in such funds have no valid stock fraud claim if fund managers turn out to be less skillful at balancing their portfolios than the investors hoped; if that is all that the appellants in this case were claiming, their suit would be properly dismissed. But they are not alleging unsuccessful balancing. Their claim is that the fund managers misrepresented when they announced their intention to try to balance the funds to an extent that would insulate against significant rate fluctuations, yet planned, from the outset and thereafter, to structure the portfolios in a way that would yield benefits only if their undisclosed bet on rising interest rates was successful.
 
 
 58
 The Court asserts that the prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed. A reasonable investor could not have read the prospectuses without realizing that, despite the use of balancing in an attempt to minimize the impact of fluctuating interest rates, a significant downturn in interest rates could decrease the value of the Trusts and decrease earnings.
 
 
 59
 98 F.3d at 5 (footnote omitted). This assertion misconceives the risk on which this suit is based. The appellants are not suing because of the disclosed risk that if interest rates declined, asset values would decline. They are suing because of the undisclosed risk that the fund managers would structure the initial portfolios and make investment decisions thereafter by selecting securities that would respond significantly to rate fluctuations that the managers believed, but did not disclose, would be rate rises. The investors accepted the risk that interest rates might decline and that imperfect balancing might cost them some money. They did not accept the risk that a fund, sold as being balanced in order to minimize the effects of interest rate fluctuations, would in fact be deliberately tilted so heavily in the expectation of rising interest rates that a decline in interest rates would incur devastating losses.
 
 
 60
 It is no answer to suggest that the funds were "balanced" in that they contained some securities whose values would move in opposite directions in response to interest rate fluctuations. Appellants do not claim that no balancing occurred; clearly, there was some diversification in the portfolios. The claim is that whatever balancing occurred was undertaken, initially and thereafter, on the undisclosed prediction by the fund managers that interest rates would rise. The fact that some mortgage-backed securities and some IO strips were included in the portfolios indicates only that some diversification occurred. The significant losses occurred because of the undisclosed fact that the fund managers, betting heavily on rising interest rates, purchased on a highly leveraged basis a quantity of IO strips of particular rates and maturities to such an extent that interest rate declines proved devastating.
 
 
 61
 It may well be, as the majority suggests, that portfolio managers of funds claimed to be balanced must inevitably make some predictions about future interest rates. Since it is unlikely that interest rates will remain completely static for any significant period of time, a manager of a balanced portfolio probably makes some prediction of the likely near-term direction of rates. But the whole point of balancing is to structure a portfolio so as to minimize the effects of any interest fluctuations, whether interest rate declines or rises are expected. Even a manager who believes that rates will rise will try to live up to the promise of a balanced fund by selecting a group of securities of low net convexity to guard against the risk of significant loss from rate fluctuations in either direction.
 
 
 62
 It cannot be maintained that what happened here is simply the inevitable inability of fund managers to balance as skillfully as might have been hoped. The other fixed-income funds that claimed to be balanced survived the modest interest decline that devastated the Hyperion funds. The Hyperion funds ended disastrously not because the managers lacked skill in balancing, but because they bet their investors' money so heavily on rising rates. They were free to market a fund on that basis and invite investments from those who were also willing to bet heavily on rising interest rates. But they were not free to bet heavily on rising rates and conceal this critical fact from their investors.
 
 
 63
 In a further effort to bolster the argument that the bias toward rising interest rates was disclosed, the Court points out in a footnote that the prospectuses disclosed percentage breakdowns of the initial portfolio investments. Id. at 5 n. 1. The implied point is that these percentage breakdowns enabled investors to make their own determination of the degree to which the portfolio managers were balancing and thereby infer the bias toward rising interest rates inherent in their selection of securities. The appellants respond that disclosure of only the percentages of the portfolio in various forms of securities (i.e., mortgage-backed securities and IO strips) cannot inform an investor of a bias toward rising interest rates in the absence of detail as to the precise nature of the various securities, their interest rates, and their maturities. The appellants are probably correct in their response, but, at a minimum, they are entitled to present evidence to support their basic contention that a reasonable investor, reading the prospectuses, would not have learned that the portfolios were initially invested with a heavy bet on rising interest rates. Even if such an understanding was available as to the initial investments, no reasonable investor could possibly learn that, contrary to the promises to try to balance the funds in the future in an effort to preserve capital and minimize the consequences of interest rate fluctuations, the portfolio managers always intended to reinvest with a distinct bias toward rising interest rates.
 
 
 64
 The Court also suggests that the undisclosed bias toward rising interest rates did not cause the appellants' losses, which the Court attributes to declining interest rates. I agree that the appellants cannot claim as damages the entire decline in their investment, some part of which is attributable to falling interest rates, but they are entitled to recover the difference between (a) the modest decline that would have occurred if a good faith effort to balance the funds with portfolios of low net convexity had been attempted and (b) the precipitous decline that occurred in the absence of such attempted balancing.
 
 
 65
 Investors in fixed-income securities or funds of such securities seek rates of return above Treasury issues and accept the risk that unforeseen developments might cause their asset values to drop. But they are entitled to their day in court when they allege, in a detailed complaint, that issuers have promised an attempt to balance a fund to minimize the effects of interest rate fluctuations and have in fact bet heavily on rising interest rates and used the investors' money to make that bet.
 
 
 66
 For these reasons, I respectfully dissent.
 
 
 
 [1]
 To the extent that the complaint may be read to suggest that the defendants made no attempt whatsoever to balance, such an allegation is put to rest by the prospectuses themselves. They fully disclosed the actual initial investments with a percentage breakdown and a description of different likely responses to interest rate changes. The plaintiffs do not dispute these percentages but contend that the percentages chosen did not permit a balanced portfolio when interest rates fell. The balancing may have been imperfect, but this is a matter of opinion and judgment--not the basis for a securities fraud claim, which requires a material misrepresentation or omission and is not sustained merely by a claim of poorly implemented investment strategy
 
 
 [1]
 Normally, the value of mortgage-backed securities decrease when interest rates increase, and rise when interest rates decline. These effects are enhanced by the change in the rate at which mortgagors elect to pay off their mortgages. When interest rates rise, the pay-off rate declines, and holders of mortgage-backed securities have, in effect, lengthened maturities on average and thereby reduced value. When interest rates decline, the mortgage pay-off rate rises, and holders of mortgage-backed securities have, in effect, shortened maturities on average, received back principal sooner than anticipated, and thereby enhanced value. One way of balancing a portfolio of mortgage-backed securities in order to lessen the effect of interest rate fluctuations is to purchase interest-only securities ("IO strips")--securities that entitle the holder to the interest payments of a mortgage, but no principal payments. IO strips respond to interest rate fluctuations in opposite directions from mortgage-backed securities (both those that entitle the holder to receive principal and interest and those that entitle the holder to receive only principal). Thus, the value of IO strips increases when interest rates rise and decreases when interest rates decline
 The funds in this case included significant amounts of IO strips in anticipation of rising interest rates. Some IO strips were purchased with borrowed funds, and this leveraging accentuated the adverse impact of the decline in interest rates that occurred.
 
 
 [2]
 The key sentence states, "A significant decline in interest rates could lead to a significant decrease in the Trust's net income and dividends while a significant rise in interest rates could lead to only a moderate increase in the Trust's net income and dividends." Prospectus for Hyperion 1997 Term Trust, Inc. at 2. Identical statements were contained in the prospectuses for the 1999 and 2002 funds