Siamac SEDIGHIM, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

DONALDSON, LUFKIN & JENRETTE, INC., Donaldson, Lufkin & Jenrette Securities Corp., Credit Suisse Group, Diamond Acquisition Corp., AXA S.A., AXA Financial, Inc., the Equitable Life Assurance Society of the United States, John S. Chalsty, Joe L. Roby, Stuart M. Robbins, David F. Deluca, Henri De Castries, Denis Duverne, Jane M. Gould, Louis Harris, Michael Hegarty, Henri G. Hottinguer, Hamilton E. James, W.E. Jarmain, Francis Jungers, W.J. Sanders III, John C. West, Anthony Daddino, Edward D. Miller and Stanley B. Tulin, Defendants.

No. 00 Civ. 7351(MGC).

United States District Court, S.D. New York.

Oct. 5, 2001.

Weiss & Yourman, New York, NY, by Joseph H. Weiss, Moshe Balsam, Mark D. Smilow, for Lead Plaintiffs Vitali Lipanov and Mark Pasquale.

Shearman & Sterling, New York, NY by: Alan Goudiss, Kathryn Tabner, for Defendants Donaldson, Lufkin & Jenrette, Inc., Donaldson Lufkin and Jenrette Securites Corp, Credit Suisse Group and Diamond Acquisition Corp.

Wachtell, Lipton, Rosen & Katz, New York, NY, by: Paul K. Rowe, for John S. Chalsty, Joe L. Roby, Stuart M. Robbins, David F. Delucia, Jane M. Gould, Louis Harris, Hamilton E. James, Francis Jungers, W.J. Sanders III, John C. West and Anthony F. Daddino.

Milbank, Tweed, Hadley, & McCloy, New York, NY, by: Michael Hirschfeld, David Gelfand, for Defendants AXA S.A., AXA Financial, Inc., The Equitable Life Assurance Society of the United States, Henri De Castries, Denis Duverne, Michael Hegarty, Henri G. Hottinguer, W.E. Jarmain, Edward D. Miller and Stanley B. Tulin.

## OPINION

CEDARBAUM, District Judge.

Plaintiffs assert claims that raise questions of first impression with respect to the

rights of holders of "tracking stock." This is a purported class action on behalf of all holders of DLJ*direct* stock, a type of common stock designed to "track" the performance of the online brokerage business of Donaldson, Lufkin & Jenrette, Inc. ("DLJ"). DLJ was acquired by the Credit Suisse Group ("CSG") in November of 2000 through a tender offer for all publicly held shares of DLJ common stock, and now does business as Credit Suisse First Boston (USA), Inc. ("CSFB"). The online brokerage business is now called CSFB*direct*.

Although Siamac Sedighim is the plaintiff named in the caption of this case, Vitali Lipanov and Mark Pasquale have been named lead plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 *et seq.* The lead plaintiffs sue DLJ, Donaldson, Lufkin & Jenrette Security Corp., DLJ's operating subsidiary, CSG, Diamond Acquisition Corp. ("DAC"), a wholly owned Delaware subsidiary of CSG, AXA S.A., AXA Financial, Inc., and The Equitable Life Assurance Society of the United States, the three majority shareholders of DLJ (collectively referred to as "AXA"), and several officers and directors of DLJ, CSG and AXA, alleging violations of federal and state law. Specifically, plaintiffs allege that defendants violated (1) Sections 11 and 12 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, by making material misrepresentations and omissions in connection with the initial public offering of DLJ*direct* stock and (2) Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, by making material misrepresentations and omissions in the tender offer materials. Plaintiffs also assert claims for fraud and breach of contract under Delaware law.

The AXA defendants and the CSG and DLJ defendants have made separate motions to dismiss the complaint under Fed. R.Civ.P. 9, 12(b)(1) and 12(b)(2). For the following reasons, the motions are granted.

## BACKGROUND

Prior to the consummation of the tender offer, DLJ was a Delaware financial services holding company doing business through its principal subsidiary, DLJ Securities Corp., and DLJ*direct*, its online brokerage business. Approximately 30% of the DLJ common stock was publicly held, and the remaining 70% was owned by defendant AXA S.A., a French company, and its affiliates AXA Financial and the Equitable Life Assurance Society of the United States. CSG, a Swiss corporation, is the parent of CSFB. DAC was a wholly owned Delaware subsidiary of CSG and the entity through which the tender offer was carried out. Following the completion of the tender offer, DLJ and DAC merged, with DLJ as the surviving corporate entity. The individual defendants are officers and directors of DLJ and AXA.

### The DLJ*direct* Offering and Prospectus

In late May, 1999, DLJ issued 16 million shares of DLJ*direct* stock for $20 per share in an initial public offering. It retained 84.3 million DLJ*direct* shares. The DLJ*direct* stock was intended to "track" the DLJ*direct* online brokerage business. In other words, the value of DLJ*direct* shares would vary with the performance of the online brokerage business. The DLJ*direct* business was separated from the rest of DLJ's business for accounting purposes. A wholly-owned subsidiary of DLJ, DLJ*direct* Holdings ("Holdings"), held title to a majority of DLJ*direct* assets, but DLJ*direct*, itself, was a division of DLJ and not a separate corporate entity.

In connection with the IPO, DLJ filed a Registration Statement and Prospectus (the "Prospectus") with the SEC. The Prospectus stated the following:

Holders of DLJ*direct* common stock will not have any claims on the assets of DLJ*direct*.

Even though from a financial reporting standpoint we have allocated our consolidated assets, liabilities, revenue, expenses and cash flow between DLJ*direct* and DLJ, that allocation will not change the legal title to any assets or responsibility for any liabilities ... Further, in any liquidation, holders of DLJ*direct* common stock will receive a share of the net assets of [DLJ}] based on the relative trading prices of DLJ*direct* common stock and DLJ common stock rather than on any assessment of the actual value of DLJ*direct* or DLJ.

DLJ*direct* Prospectus ("Prosp.") at 11. It also said that holders of DLJ*direct* stock will have no voting rights, except in limited circumstances where a separate class vote is required by Delaware law. Prosp. at 6, 11, 75.

In the section on risk factors, the Prospectus stated that DLJ could not guarantee that the price of the stock would track the performance of the DLJ*direct* business as intended, and that DLJ*direct* shareholders would be common shareholders of DLJ, subject to all of the risks of investment in DLJ and all its businesses. Prosp. at 11. It also said that material financial events which occur at DLJ may affect DLJ*direct'*s financial position.

Contrary to plaintiffs' allegations, the Prospectus did not represent that DLJ*direct* shareholders would be entitled to all the benefits of ownership of DLJ common stock. The Prospectus said that DLJ*direct* shareholders would be "common shareholders of Donaldson, Lufkin and Jenrette, Inc.," Prosp. at 11, but it made clear that DLJ*direct* common stock was not the same as DLJ common stock. For example, the Prospectus Summary stated that "[w]e are offering you shares of DLJ*direct* common stock, but we are not offering you any shares of DLJ common stock." Prosp. at 4.

The Prospectus further disclosed that there would be conflicts of interest between DLJ shareholders and DLJ*direct* shareholders, and that the DLJ board might make decisions favoring DLJ shareholders. Prosp. at 11, 15–15, 50–51. As an example of the type of decisions in which a conflict might arise, the Prospectus mentioned "decisions on how to allocate consideration received from a merger involving [DLJ] between holders of DLJ common stock and DLJ*direct* common stock." Prosp. at 11.

The Prospectus also stated that in the event of a sale of more than 80% of the assets of DLJ*direct*, DLJ*direct* shareholders would be entitled to one of the following: (1) a dividend in an amount equal to the proportionate interest in the net proceeds of the sale, (2) redemption of DLJ*direct* shares for an amount equal to the proportionate interest in the net proceeds of the sale, or (3) issuance of DLJ stock at a 10% premium over the value of DLJ*direct* shares. Prosp. at 6, 71–72.

Finally, in a paragraph captioned "Relationship with DLJ," in which the Prospectus discussed potential conflicts between DLJ*direct* and DLJ with respect to cash management and allocation policies, the Prospectus stated that

DLJ intends to reconstitute the board of [Holdings].... Shortly after the consummation of the offering, DLJ intends to add two outside directors to the board of directors of [Holdings]. DLJ's current intent is to submit all significant transactions including significant 'intercompany' transactions between DLJ and DLJ*direct*, for approval by the board of directors of [Holdings]. The decisions of the board of DLJ and Holdings would be subject to the board of directors general fiduciary duty. However, there can

be no assurance that transactions between DLJ*direct* and DLJ could not be effected on more favorable terms with unaffiliated, third parties.

Prosp. at 51. The Holdings board of directors did not vote on the proposed CSG tender offer. Neither did the DLJ board of directors obtain a fairness opinion concerning the fairness of the tender offer to DLJ*direct* shareholders.

### The Tender Offer and Merger

On September 8, 2000, CSG and DAC announced a cash tender offer for all publicly owned shares of DLJ common stock at a price of $90 per share. Previously, on August 30, 2000, CSG and AXA had entered into a Stock Purchase Agreement, pursuant to which CSG privately purchased the shares of DLJ common stock held by AXA. The value of the consideration that CSG paid to AXA for its shares was the same as that offered to the public shareholders in the tender offer, except that AXA received a combination of cash and CSG stock valued at $90 per share. Also on August 30, 2000, CSG and DLJ entered into an Agreement and Plan of Merger Among Credit Suisse Group, Diamond Acquisition Corp. and Donaldson Lufkin and Jenrette, Inc. (the "Merger Agreement"). The Merger Agreement provides that, following the merger, DLJ will continue to be governed by the Certificate of Incorporation and By-laws in existence immediately prior to the merger.

In connection with the tender offer, DLJ shareholders, but not DLJ*direct* shareholders, received a Tender Offer Statement on Schedule TO ("Schedule TO"), prepared by CSG, which set out the terms of the tender offer and included, as exhibits, the Stock Purchase Agreement and Merger Agreement. The DLJ shareholders, but not the DLJ*direct* shareholders, also received a Tender Offer Solicitation/Recommendation Statement on Schedule 14D–9 ("Schedule 14D–9"), prepared

by DLJ, in which the DLJ board recommended that the DLJ shareholders accept the tender offer. The Schedule TO and Schedule 14D–9 (collectively the "tender offer documents") were filed with the SEC on September 8, 2000.

Included in the Schedule 14D–9 was a 14F–1 Information Statement, in which DLJ stated that only the holders of DLJ common shares would be entitled to vote if a vote was necessary to approve the merger between DLJ and DAC. CSG did not disclose financial information about itself in the tender offer materials, but instead stated "[b]ecause the form of payment in the offer consists solely of cash and our offer is not contingent upon our receipt of financing, we do not believe that our financial condition is relevant to your decision to tender in the offer." Schedule TO at 4.

Following the consummation of the tender offer, CSG carried out a merger of DLJ and DAC, with DLJ retaining its corporate identity.

### DISCUSSION

#### Standard for Motion to Dismiss

■■■ On a motion to dismiss, the court must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the plaintiffs. *King v. Simpson*, 189 F.3d 284, 287 (2d Cir.1999). A complaint may be dismissed under Fed.R.Civ.P. 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" of the complaint. *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996) (internal quotes omitted). If, however, allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true. *See id.* at 5–9 (affirm-

ing grant of dismissal where prospectus was not misleading); *Steinberg v. PRT Group,* 88 F.Supp.2d 294, 300 (S.D.N.Y. 2000). But the court may not choose among plausible interpretations of the disclosure documents—if a trier of fact could agree with plaintiffs' interpretation of the relevant language, the motion to dismiss must be denied. *See Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999). To that end, a court may properly consider documents discussed in the complaint and all public disclosure documents filed by the defendants without converting the motion to one for summary judgment. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991).

### The '33 Act Claims

Plaintiffs allege that the Prospectus contained material misstatements or omissions in violation of Sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77*l*(a)(2). Section 11 states:

> In case any part of the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may ... sue-
>
> (1) every person who signed such a registration statement; [and]
>
> (2) every person who was a director of ... the issuer at the time of the filing.

15 U.S.C. § 77k(a). Section 12(a)(2) provides that any person who

> offers or sells a security ... by means of a prospectus or oral communications, which includes an untrue statement of material fact or omits to state to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading,

shall be liable to the purchaser of the security. 15 U.S.C. § 77*l*(a)(2).

 "A fact is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares." *In re Northern Telecom Sec. Litig.,* No. 93 Civ. 4384(MGC), 1994 WL 455534, *4 (S.D.N.Y. Aug. 22, 1994)(internal quotations omitted). An omission is material if disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the "total mix" of the information made available. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

 The gravamen of plaintiffs' claims under Sections 11 and 12(a)(2) is that it was not clear from the Prospectus that a tender offer for the publicly held shares of DLJ could be consummated without the participation of the DLJ*direct* shareholders. Plaintiffs argue that the disclosure in the "Risk Factors" section of the Prospectus that holders of DLJ*direct* shares would be subject to all the risks of investment in DLJ, and, consequently, that financial information for DLJ*direct* should be read in conjunction with financial information for DLJ, somehow entitles them to all the benefits of investment in DLJ, notwithstanding that DLJ*direct* shares and DLJ shares are different securities. This reading is simply not plausible. The Prospectus enumerates the fairly limited rights of DLJ*direct* shareholders in the "Summary" and "Description of Capital Stock." There is no reason for any shareholder to understand the disclosure of additional risks as a grant of additional rights.

 Similarly, plaintiffs allege that the disclosure of a potential conflict between DLJ and DLJ*direct* shareholders with respect to the allocation of consideration from a merger misleadingly implied that

they would receive consideration in any merger, whether or not it involved the equity interests of DLJ*direct* shareholders. Again, nothing in the enumeration of the rights of DLJ*direct* shares suggests this conclusion. A reasonable shareholder would expect to receive consideration only in a merger in which his equity interest was acquired. That was not the case in this merger.

Plaintiffs also argue that the discussion of DLJ*direct* shareholders rights in the event of a liquidation or sale of at least 80% of the assets of DLJ*direct* (the "premium rights") gives the impression that the rights would be triggered in a transaction like the one at issue. Under Delaware law, however, neither a tender offer nor a merger is a liquidation. *See Rothschild International Corp. v. Liggett Group Inc.,* 474 A.2d 133, 136 (Del.1984). "The term 'liquidation' when applied to a corporation, means the winding up of the affairs of the corporation by getting in its assets, settling with the creditors and debtors and apportioning the amount of profit and loss." *Id.* (internal quotations omitted). Moreover, the Prospectus states that "[n]either the merger nor consolidation of [DLJ] with any other entity ... would alone be deemed a liquidation, dissolution or winding up" for purposes of DLJ*direct* shareholders' liquidation rights. Prosp. at 76. Plaintiffs acknowledge this disclosure, but argue that it implies that a merger *could,* under some circumstances, constitute a liquidation, and that whether such circumstances are present here is an issue of fact. Plaintiffs, however, have not alleged facts, such as the cashing out of assets, paying creditors and apportioning profit and loss, from which a fact-finder could find that DLJ was liquidated.

Similarly, a merger is distinct from a sale of assets under Delaware law, *see Sterling v. Mayflower Hotel Corp.,* 93 A.2d 107, 112 (Del.1952), and "the distinc-

tion is not merely one of form, as the plaintiffs say, but of substance." *Id.* When an actual transfer of assets is structured as a merger, Delaware courts may consider the substance of the transaction in determining whether the transaction is a "sale of assets." *See In re GM Class H Shareholders Litig.,* 734 A.2d 611, 623 (Del.Ch.1999) (considering, in a suit by holders of a class of General Motors stock that tracked the performance of an electronics subsidiary, whether the spin off of a portion of the assets of the subsidiary was a sale of substantially all the assets of the subsidiary to trigger a recapitalization provision of the certificate of incorporation); *Bacine v. Scharffenberger,* No. 7862, 1994 WL 21128 *3, 1984 Del.Ch. LEXIS 501, at *7 (Del. Ch. Dec. 11, 1984) (considering whether the merger of three subsidiaries of a holding company with a third party was a sale of substantially all the holding company's assets under DGCL § 271). Here, however, DLJ did not alienate any assets—it survived the merger and continues to hold and operate all the DLJ*direct* assets under the name CSFB*direct.* Plaintiffs suggest that regardless of the meaning of the relevant terms under Delaware law, a reasonable shareholder could believe that the premium rights were triggered by the CSG tender and merger. While on a motion to dismiss, all ambiguities must be resolved in favor of plaintiffs, the words in question are well-defined corporate terms of art and are not ambiguous.

Plaintiffs also repeatedly suggest that their premium rights were abrogated or diminished by the tender offer and merger, and that omission of this possibility from the Prospectus was materially misleading. Clearly plaintiffs wanted to participate in the tender offer, but the offeror was not interested in acquiring their shares. The DLJ shareholders, public and private, sold their respective interests in

DLJ, which were subject to the rights of DLJ*direct* shareholders. Following the merger, in which DLJ was the surviving corporate entity, the DLJ Certificate of Incorporation and By-laws, which provide for the premium rights, are still in effect. Plaintiffs provide no reason why CSG would not have to honor those rights in the event of a liquidation of CSFB or a sale of 80% or more of the assets of CSFB*direct.*

◼︎ Plaintiffs further allege that the representation in the Prospectus that "all significant transactions" would be submitted to the Holdings board for approval was misleading. Alternatively, they claim that the failure to disclose in the tender offer materials that the transaction was not submitted to the Holdings board was misleading. As discussed below, plaintiffs' shares were not the target of the tender offer, and, therefore, plaintiffs lack standing to challenge the tender offer disclosures. In any event, the context of the representation makes it clear that the Prospectus is referring to all significant transactions between DLJ*direct* and DLJ, not transactions between DLJ and third parties. The preceding paragraph refers to "cash management policies and allocations policies with respect to intercompany transfers and other allocations between DLJ and DLJ*direct*" and discusses how DLJ will manage the cash flow of DLJ*direct.* Prosp. at 50. In the next sentence, the Prospectus states that "there can be no assurance that transactions between DLJ*direct* and DLJ could not be effected on more favorable terms with third parties." *Id.* at 51.

◼︎ Arguably, the reference to "all significant transactions" may also refer to transactions between DLJ*direct* and third parties. However, the conclusion that plaintiffs wish to draw—that DLJ management intended to grant veto power over transactions between DLJ and third parties to the Holdings board, the members of

which are not fiduciaries of DLJ shareholders—is not tenable. Adequacy of disclosure is not assessed by looking at a single sentence in a vacuum, but rather the question is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990). The Prospectus discloses in numerous places that the interests of DLJ*direct* shareholders may be subordinated to the interests of DLJ shareholders. Plaintiffs' interpretation ignores that disclosure. When read in connection with the rest of the Prospectus, the statement regarding "all significant transactions" could not have misled a reasonable shareholder.

◼︎ Lastly, plaintiffs allege that the Prospectus failed to disclose that CSG had contacted AXA in the winter of 1998, prior to the DLJ*direct* offering, about the possibility of acquiring AXA's interest in DLJ as part of a transaction in which CSG would acquire all of the outstanding shares of DLJ. The allegations in the Complaint rely entirely on statements made by CSG in its disclosure documents. Those documents, however, say that the contact was informal and no substantive discussions took place, and that DLJ management met with other financial institutions from time to time to discuss "strategic alliances, including combinations." Schedule TO at 20. The materiality of preliminary acquisition discussions "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic, Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Plaintiffs do not allege any facts suggesting that the CSG/AXA contact was more significant than the tentative discussions

with other institutions, or that it was more likely than other strategic alternatives considered by the company. Hindsight is always 20/20. "The probability of a transaction occurring must be considered in light of the facts as they then existed, not with the hindsight knowledge that the transaction was or was not completed." *Panfil v. ACC Corp.*, 768 F.Supp. 54, 58–59 (W.D.N.Y.1991). In light of the fact that DLJ in the normal course of business had exploratory discussions about possible business combinations with other institutions, the preliminary contact between CSG and AXA would not significantly have altered the "total mix" of information available, *see TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and, without the benefit of hindsight, the contact was "so unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985).

### The '34 Act Claim

Plaintiffs also allege that the tender offer materials violated Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, as supplemented by the Williams Act of 1968. Section 14(e) makes it unlawful

> for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition or

in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e) (2000).

■ Defendants argue that DLJ*direct* shares were not the target of the tender offer, and, consequently, DLJ*direct* shareholders lack standing to sue under § 14(e). A private cause of action is not expressly provided for in the statute, but the Supreme Court, in *Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), found that a private right of action was implied for the class of shareholders whose shares are sought in a tender offer. *Id.* The *Piper* Court held, however, that the private right of action did not extend to a defeated tender offeror. *Piper*, 430 U.S. at 24–42, 97 S.Ct. 926. In reviewing the legislative history of the statute, the *Piper* Court concluded that "the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Id.* at 35, 97 S.Ct. 926. It quoted with approval *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), which stated that "[t]he purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer *for their stock* will not be required to respond without adequate information." *Piper*, 430 U.S. at 35, 97 S.Ct. 926 (emphasis added). Plaintiffs are not holders of the security sought in the CSG tender offer, and, therefore, do not have standing to sue under § 14(e). *See also Metropolitan Securities v. Occidental Petroleum*, 705 F.Supp. 134, 138–140 (S.D.N.Y.1989) (holders of convertible debentures lacked standing under § 14(e)).[1]

Plaintiffs argue that § 14(e) was intended to protect all equity investors in the context of a tender offer, and that the

---

[1] Because the *Piper* decision is controlling authority that denies plaintiffs standing, an analysis of the *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), factors for implying private rights of action is unnecessary.

*Piper* holding should be limited to its facts. The *Piper* Court, however, considered and rejected Justice Stevens' argument, in dissent, that since the plaintiff-offeror was a shareholder of the company, it was an intended beneficiary of § 14(e) and so had standing to sue. Instead, the Court focused on the "precise goals" of the Williams Act, which were to insure that the "target shareholder," i.e. "the person who is required to make a decision," receives adequate disclosure. *Id.* at 36 n. 23, 97 S.Ct. 926 (internal quotes omitted).[2]

▮▮▮▮ Although not pleaded in the Complaint, plaintiffs now also argue that the S.E.C.'s "All Holders, Best Price" rule, 17 C.F.R. § 240.14d–10, required CSG to extend its tender offer to DLJ*direct* shareholders. The All Holders Rule provides that no bidder shall make a tender offer unless the same offer is open to all the holders of the "class" of securities subject to the tender offer. 17 C.F.R. § 240.14d–10(a)(1)–(2). While DLJ common stock and DLJ*direct* stock are both common stock, and, therefore, are different "series" of the same "class" of securities, the language of Rule 14d–10 should not be parsed so finely. In the context of the Rule, the word "class" is best understood more generally as "type" of security rather than under its narrower, technical meaning. *Cf.* 15 U.S.C. § 78*l*(g)(5) (with respect to the registration requirements of § 12 of the '34 Act, "the term 'class' shall include all securities of an issuer which are of substantially similar character and the holders of which enjoy substantially similar rights and privileges"). Indeed, the interpretation advanced by plaintiffs would yield an absurd result. It would require

an offeror to purchase DLJ*direct* shares for the same price as the DLJ shares even though they are vastly different securities with different rights, and trade at significantly different prices in the market. The purpose of the All Holders Rule is to insure equal treatment in a tender offer for all similarly situated investors, not to erase distinctions between holders of different types of securities. Accordingly, the Rule does not apply to DLJ*direct* shareholders.

### State Law Claims

Plaintiffs also assert claims for breach of contract and breach of fiduciary duty under Delaware law. Since the federal claims have been dismissed, supplemental jurisdiction over the remaining state claims is discretionary. 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). I decline to exercise supplemental jurisdiction in this case.

▮▮▮▮ Plaintiffs, however, now also assert diversity jurisdiction under 28 U.S.C. § 1332(a)(2). In a class action, diversity jurisdiction requires complete diversity among the class representatives and the defendants. *See Snyder v. Harris,* 394 U.S. 332, 340, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). No class has yet been certified in this case. Before class certification, it seems sensible to consider, as plaintiffs suggest, the citizenship of the lead plaintiffs, who are the purported class representatives. *See Oliva v. Chrysler Corp.,* 978 F.Supp. 685, 688 n. 1 (S.D.Tex. 1997) (basing diversity jurisdiction on citizenship of purported class representa-

---

**2.** Courts in this district have extended standing to sue under § 14(e) to traders of options for target shares. *See In re Gulf Oil/Cities Service Tender Offer Litig.,* 725 F.Supp. 712 (S.D.N.Y.1989); *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179 (S.D.N.Y.1981). Option trading, however, necessarily involves trading of target shares when the options are exercised, and the investment decisions of option traders—whether to buy or sell options—is affected in the same way by a tender offer as the investment decisions of target shareholders. The same cannot said for holders of DLJ*direct* stock.

tives). In their brief in opposition to these motions, lead plaintiffs assert that lead plaintiff Lipanov is a citizen of a foreign state. However, Mr. Weiss, counsel for lead plaintiffs, represented at the January 4, 2001, oral argument on the motion for appointment of lead plaintiffs that lead plaintiff Pasquale is a United States citizen domiciled in Switzerland. "United States citizens who are domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state, and § 1332(a) does not provide that the courts have jurisdiction over a suit to which such persons are parties." *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 68 (2d Cir.1990). Accordingly, the state claims are dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, defendants motions to dismiss are granted.

SO ORDERED.